**Phillip L. BROWN, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

No. 2006–SC–000654–MR.

Supreme Court of Kentucky.

June 17, 2010.

586

Emily Holt Rhorer, Samuel N. Potter, Donna Lynn Boyce, Appellate Branch Manager, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, David Wayne Barr, Assistant Attorney General, Office of Attorney General, Office of Criminal Appeals, Frankfort, KY, William Robert Long, Jr., Assistant Attorney General, Criminal Appellate Division, Counsel for Appellee.

Opinion of the Court by Justice ABRAMSON.

Phillip Brown appeals from an August 21, 2006 judgment of the Warren Circuit Court, convicting him of first-degree burglary, in violation of KRS 511.020; of first-degree robbery, in violation of KRS 515.020; and of murder, in violation of KRS 507.020. Brown was sentenced to consecutive twenty-year prison terms for

both the burglary and the robbery, and he was sentenced to death for the murder. The Commonwealth alleged, and the jury found, that during the early morning hours of January 11, 2001, Brown forcibly entered the residence of Sherry Bland and that in the course of stealing her television set and possibly money or other items from her purse, he killed Bland, by stabbing her with a steak knife and beating her repeatedly with a tire iron. Brown challenges both his conviction and his sentence, alleging some twenty errors by the trial court and raising several additional arguments against the death penalty. We reject Brown's claims of error with respect to his conviction, but we agree with him that he was improperly subjected to the death penalty in his second trial. Accordingly, we affirm the trial court's judgment to the extent that it finds Brown guilty of the charged crimes and sentences him to consecutive twenty-year prison terms for robbery and burglary, but we reverse Brown's death sentence for murder and remand for resentencing with respect to that crime.

### RELEVANT FACTS

Brown's 2006 Warren County trial was his second trial for the alleged offenses against Sherry Bland. Bland resided on Pine Tree Street in Columbia, in Adair County, and it was an Adair Grand Jury that indicted Brown on August 13, 2002. Brown was tried in that county and convicted of the same three offenses in September 2003. At that trial, the jury found two aggravating circumstances pursuant to KRS 532.025 but did not recommend the death penalty. Instead, the first jury recommended a sentence of life in prison without the possibility of parole for at least twenty-five (25) years. Brown appealed from the Adair Circuit Court Judgment, and in an unpublished opinion in August 2005, this Court reversed Brown's conviction because his Sixth Amendment right to cross-examine certain key prosecution witnesses had been improperly limited. On remand, the parties agreed to transfer venue to Warren County, and Brown was retried in the Warren Circuit Court in May 2006.

In addition to the horrific crime-scene evidence, which established beyond any doubt that Bland had been murdered, the Commonwealth's proof at trial fell roughly into three categories. There were witnesses—Jerry Kemp, Charlene Palmer, and Barbara Slater—who connected Brown to the stolen television set. Kemp, who had been a close friend of Brown, testified that at 3:00 or 4:00 one morning at about the time of the murder, Brown had come to his, Kemp's, apartment with a television set similar to the one stolen from Bland. Kemp testified that he kept the television for a few weeks until he heard on the news that a similar television had been taken from Bland's residence. Barbara Slater, Kemp's mother, testified that she too became concerned when she learned about the theft of Bland's television. She testified that she confronted Brown with her concerns and told him to remove the set from Kemp's apartment. Soon thereafter, according to Kemp, he and Brown hauled the television set to a spot outside of town on Lampton Lane where they dumped it on the side of the road. Palmer, Kemp's companion at the time, confirmed Kemp's testimony that Brown had brought the television to their apartment early one morning and that a few weeks later he and Kemp had hauled it away. She testified that before removing the set, Brown had wiped it with bleach and covered it with a baby blanket. Although the police did not discover a television at the place Kemp said he and Brown had left it, two residents of that area testified that in late March or early

April of 2000 they found a television matching the description of Bland's set lying beside Lampton Lane and hauled it to the dump.

The Commonwealth's proof also included witnesses—Eddie Ingram, Archie Lane, and Stephanie McClain—who testified that Brown had confessed to the killing. Ingram, one of Brown's friends, testified that several months after the killing, Brown "just kind of said that he did it." Ingram and Lane, another friend, both testified that a third friend, Shane Hughes, had told them that Brown had confessed to him. Lane testified that according to Hughes, Brown had said, "If you don't believe I did it, go by and the back door will be open." This statement was particularly significant, because the person who discovered Bland's body had indeed found the back door open, but the police had never made that fact public. Lane also testified that when he asked Brown how his case was going, Brown said that he might be alright if everybody would quit talking. McClain testified that her boyfriend, another of Brown's friends, told her that Brown had confessed to the killing to him.

The Commonwealth's third line of proof included forensic witnesses whose analysis of one of the murder weapons, the tire iron, had isolated a mixed DNA sample to which Brown was a very likely contributor. The DNA analyst testified that one of the contributors to the mixture was a male, that both Bland and Brown were potential contributors, and that the odds that a person chosen at random from the United States' population would be a contributor were 1 in 40,000.

The Commonwealth also played for the jury a video recording of Brown's testimony during his Adair County trial. During that testimony Brown admitted that in November of 2000, he had falsely told an investigating detective that Jerry Kemp and his brother, Joseph Kemp, had told him, Brown, that they had stolen a television set from a woman and that in the course of the theft things "had gotten rough." Brown claimed to have fabricated the story in retaliation for the Kemps' allegations against him.

To counter this formidable evidence, Brown sought to show that the first group of witnesses were testifying falsely because they bore a grudge against his uncle; that the second group, all of whom had legal problems of their own, were testifying falsely in exchange for favors from the Commonwealth; and that the third group, the forensic witnesses, were not certain that his DNA was on the tire iron, and even if it was they could have placed it there themselves by mishandling the various exhibits given to them for analysis.

As noted, the jury was persuaded by the Commonwealth's proof and found Brown guilty of all three charges. Brown raises numerous errors on appeal. His first contention is that because he was sentenced to life imprisonment without the possibility of parole for twenty-five (25) years and not to death at his first trial, the Commonwealth was precluded from seeking the death penalty against him at retrial.

## ANALYSIS

**I. Brown's Aggravated Sentence of Life Without the Possibility of Parole for 25 Years at the First Trial Was a Finding That the Commonwealth Had Not Proved That Death Was the Appropriate Penalty and it Precluded the Death Penalty at Any Subsequent Trial for the Same Capital Offense.**

■ Under Kentucky law, murder is a capital offense. KRS 507.020(2). This means that in prosecutions for murder the Commonwealth is authorized to seek the

death penalty, and, if it does, a murder conviction calls into effect KRS 532.025. That statute lists various circumstances tending to aggravate or to mitigate the offense and provides that a defendant convicted of a capital crime may be sentenced to death if, but only if, at the conclusion of a presentence hearing, the finder of fact— the jury—finds the existence of at least one of the listed aggravating circumstances and determines, after considering all the evidence in aggravation and in mitigation, that death is the appropriate punishment. Viewing this process, and more particularly, the jury instructions employed in the sentencing process in this case, in light of controlling Double Jeopardy Clause precedent, we are convinced that after Brown's first trial concluded with a verdict fixing his punishment at the aggravated sentence of life without the possibility of parole for twenty-five (25) years, the Commonwealth was precluded from seeking the death penalty a second time. Because this conclusion departs from, indeed overrules, *Commonwealth v. Eldred,* 973 S.W.2d 43 (Ky.1998), and *Salinas v. Payne,* 169 S.W.3d 536 (Ky.2005), we must address in some detail the evolution of controlling United States Supreme Court precedent with regard to this issue.

In *Bullington v. Missouri,* 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981), the United States Supreme Court held that capital sentencing schemes that require the finder of fact to make specific findings, if death is to be imposed, in addition to those findings required for conviction of the underlying crime itself, implicate the Double Jeopardy Clause of the Fifth Amendment. That Clause commands that "[n]o person shall ... be subject for the same offense to be twice put in jeopardy of life or limb." In *Bullington,* the Court concluded that a defendant who emerged from his first capital trial with a sentence of life without parole for fifty (50) years

could not be subjected a second time to the death penalty when a retrial was necessitated by virtue of improprieties in the composition of the jury. While *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) recognized that generally there is no double jeopardy bar to retrying a defendant who has successfully challenged his conviction, the "clean slate" rationale is "inapplicable whenever a jury agrees or an appellate court decides that the prosecution has not proved its case." *Bullington,* 451 U.S. at 443, 101 S.Ct. 1852. This holding was a logical extension of both *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), which held that a defendant could not be retried if his conviction was reversed because of insufficient evidence, and *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), which held that conviction of a lesser-included offense operates as an implied acquittal of the greater offense.

> By enacting a capital sentencing procedure that resembles a trial on the issue of guilt or innocence ... Missouri *explicitly requires* the jury to determine whether the prosecution has "proved its case." Both *Burks* and *Green,* as has been noted, state an exception to the general rule relied upon in *North Carolina v. Pearce.* That exception is applicable here, and we therefore refrain from extending the rationale of *Pearce* to the very different facts of the present case. Chief Justice Bardgett, in his dissent from the ruling of the Missouri Supreme Court majority, observed that the sentence of life imprisonment which petitioner received at his first trial meant that "the jury has already acquitted the defendant of whatever was necessary to impose the death sentence." 594 S.W.2d, at 922. We agree.

451 U.S. at 445, 101 S.Ct. 1852.

Three years later, in *Arizona v. Rumsey,* 467 U.S. 203, 104 S.Ct. 2305, 81

L.Ed.2d 164 (1984), the Supreme Court confronted a case in which a trial judge's finding of no aggravating circumstances and judgment imposing a life sentence without parole for twenty-five (25) years had been set aside and, following remand on other grounds, the sentencing judge then found a different aggravating circumstance and imposed the death sentence. Affirming the Arizona Supreme Court's holding that the death sentence violated the Double Jeopardy Clause as construed in *Bullington, supra,* Justice O'Connor wrote:

> The double jeopardy principle relevant to respondent's case is the same as that invoked in *Bullington:* an acquittal on the merits by the sole decisionmaker in the proceeding is final and bars retrial on the same charge. Application of the *Bullington* principle renders respondent's death sentence a violation of the Double Jeopardy Clause because respondent's initial sentence of life imprisonment was undoubtedly an acquittal on the merits of the central issue in the proceeding—whether death was the appropriate punishment for respondent's offense. The trial court entered findings denying the existence of each of the seven statutory aggravating circumstances, and as required by state law, the court then entered judgment in respondent's favor on the issue of death. That judgment, based on findings sufficient to establish legal entitlement to the life sentence, amounts to an acquittal on the merits and, as such, bars any retrial of the appropriateness of the death penalty.

467 U.S. at 211, 104 S.Ct. 2305.

A different, but related, issue arose two years later in *Poland v. Arizona,* 476 U.S. 147, 148, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), when the Supreme Court considered whether there was a double jeopardy bar to further capital proceedings "when, on appeal from a sentence of death, the reviewing court finds the evidence insufficient to support the only aggravating factor on which the sentencing judge relied, but does not find the evidence insufficient to support the death penalty." In that case, the trial judge had found the state's "especially heinous, cruel or depraved" aggravating circumstance present and imposed the death sentence on two defendants, but the Arizona Supreme Court deemed the evidence insufficient to satisfy that particular aggravator. Reversing and remanding for an error in the guilt phase, the Arizona Supreme Court held the defendants nonetheless could be subjected on remand to the death penalty because there was ample evidence that the murder was for "pecuniary gain," another aggravator under Arizona law. After the death penalties imposed were subsequently affirmed by the Arizona Supreme Court, the United States Supreme Court upheld them as well, distinguishing *Bullington* and *Rumsey:*

> At no point during petitioners' first capital sentencing hearing and appeal did either the sentencer or the reviewing court hold that the prosecution had "failed to prove its case" that petitioners deserved the death penalty. Plainly, the sentencing judge did not acquit, for he imposed the death penalty. While the Arizona Supreme Court held that the sentencing judge erred in relying on the "especially heinous, cruel, or depraved" aggravating circumstance, it did not hold that the prosecution has failed to prove its case for the death penalty.

> \* \* \* \* \* \*

> *Bullington* indicates that the proper inquiry is whether the sentencer or reviewing court has "decided that the prosecution has not proved its case" *that the death penalty is appropriate.*

476 U.S. at 154–55, 106 S.Ct. 1749 (emphasis in original).

Over a decade later, in *Eldred, supra*, the Kentucky Supreme Court confronted for the first time the double jeopardy implications of Kentucky's capital sentencing scheme and, relying on *Bullington* and *Rumsey*, found no bar to a defendant being sentenced to death following a second trial despite having received a sentence of life without the possibility of parole for twenty-five (25) years at the conclusion of his first trial. The four-justice majority concluded that *Bullington* sprang from two sources, *Burks* and *Green, supra*, and thus the first issue was whether there was sufficient evidence introduced to justify the death penalty in *Eldred*'s first trial. Because the first jury had found the statutory aggravating factor of "murder for hire" under the "beyond a reasonable doubt" standard, the majority concluded that "the prosecution had carried its burden that death was an appropriate sentence." *Eldred*, 973 S.W.2d at 47. Moreover, the majority concluded there had been no implied acquittal (the *Green* premise of *Bullington*) of the death penalty in the first trial because, unlike the sentencing schemes in Arizona and Missouri which give a sentencing judge or jury a bilateral choice of either death or life without parole for a specified number of years, in Kentucky "[e]ven if the jury finds the existence of an aggravating factor, the jury must still recommend a sentence within the entire range of possible sentences." 973 S.W.2d at 47. Indeed, KRS 532.030(4) does provide that even in cases where the death penalty is authorized, the jury may recommend not only the three aggravated sentences (death, life without parole, and life without parole for twenty-five (25) years), but also the sentences associated with non-aggravated murders, *i.e.*, life or a term of not less than twenty (20) nor more than fifty (50) years. Thus, in the view of the *Eldred* majority, no "implied acquittal" of the death penalty could be read into the first jury's verdict.

However, as Chief Justice Stephens wrote in strong dissent for three justices, the *Eldred* majority's approach really centered on the fact that in Missouri the jury had only two sentencing options for an aggravated murder, whereas in Kentucky there was a perceived wide range of options. Focusing instead on the "hallmarks of a trial on guilt or innocence" language in *Bullington*, the dissent identified the four factors present in that case which also applied to *Eldred*: (1) a bifurcated sentencing proceeding with (2) the burden on the state to prove beyond a reasonable doubt that death was the appropriate sentence, (3) with the state having produced evidence in an effort to meet that burden in the separate proceeding, and, finally, (4) guidance for the jury in its deliberations about penalty. Significantly, Chief Justice Stephens identified the very flaw in the majority's analysis which commands our re-evaluation:

> To obtain a death penalty for Eldred, the Commonwealth had the burden of proving two things beyond a reasonable doubt, (1) the existence of an aggravating factor, and (2) that Eldred should be sentenced to death. The jury found beyond a reasonable doubt that the aggravator of murder for hire existed. Most significantly, the jury was further instructed, "[i]f upon the whole case you have a reasonable doubt whether the Defendant should be sentenced to death, you shall instead fix his punishment at a sentence of imprisonment."

> In my view, and according to *Bullington*, the jury acquitted Eldred of the death penalty when it fixed his punishment for murder at a sentence of imprisonment for life without benefit of proba-

tion or parole until he has served a minimum of 25 years.

973 S.W.2d at 49.

This Court revisited *Eldred* in *Salinas, supra,* but found no reason to question its position despite the then-recent decision in *Sattazahn v. Pennsylvania,* 537 U.S. 101, 106, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003), a case in which a capital jury deadlocked and the sentencing judge imposed a life sentence as required by state law. The *Sattazahn* Court, with Justice Scalia writing, found no double jeopardy bar in that scenario because the jury had not "acquitted" the defendant; its deadlock was a "non-result" that could not "fairly be called an acquittal 'based on findings sufficient to establish legal entitlement to the life sentence.' " 537 U.S at 109, 123 S.Ct. 732 (citing *Rumsey, supra,* 467 U.S. at 211, 104 S.Ct. 2305). Justice Scalia further noted that the life sentence imposed by the sentencing judge (again as required by state law when a capital jury deadlocked) was also not an acquittal. Notably, five members of the U.S. Supreme Court agreed with these conclusions giving them the weight of a majority opinion. However, the portion of *Sattazahn* quoted by the Kentucky Supreme Court in *Salinas,* for the proposition that the critical point is whether the first jury made findings "that 'constituted an "acquittal" of the aggravating circumstances.' " actually comes from Part III of Justice Scalia's opinion, a part in which only Chief Justice Rehnquist and Justice Thomas joined.[1] In that section of the opinion, Justice Scalia opined that after *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) clarified the need for jury findings on every element of a criminal offense and *Ring*

*v. Arizona,* 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) established that the aggravators that make a defendant death-eligible "operate as the 'functional equivalent of an element of a *greater offense,*' " it naturally followed that murder plus an aggravating factor "is a separate offense from 'murder' *simpliciter.*" 537 U.S. at 111–12, 123 S.Ct. 732 (emphasis in original). In support of this minority position, Justice Scalia maintained that the focus is on whether the defendant was acquitted of the aggravating circumstance at the first trial. The remainder of Justice Scalia's *Sattazahn* opinion, which a majority of the Court did join, was not so narrowly focused. In only one other instance is there reference to an acquittal being synonymous with a failure to prove an aggravator and that occurs in a description of *Rumsey,* a case in which the defendant's acquittal did in fact occur when the government failed to establish an aggravating circumstance beyond a reasonable doubt. See 537 U.S. at 108, 123 S.Ct. 732.

■ In essence, the majority holding in *Sattazahn* is simply that "the touchstone for double-jeopardy protection in capital-sentencing proceedings is whether there has been an 'acquittal.' " 537 U.S. at 109, 123 S.Ct. 732. That is the import of *Bullington* and its progeny and that is what compels our decision today. Whatever uncertainty may have existed about the contours of an "acquittal" in post-conviction capital sentencing prior to *Sattazahn,* it is now clear that is not simply and solely about the state's failure to prove an aggravating circumstance beyond a reasonable doubt in the first trial. Instead, as Justice

---

1. In *Salinas,* 169 S.W.3d at 539, the opinion references the "crucial" language from *Sattazahn* as appearing at 537 U.S. at 109, 123 S.Ct. 732, which is in the majority portion of Justice Scalia's opinion. In fact, the language quoted in *Salinas* comes from 537 U.S. at 112, 123 S.Ct. 732, Part III of the *Sattazahn* opinion to which only three justices subscribed.

O'Connor wrote in *Rumsey,* 467 U.S. at 211, 104 S.Ct. 2305: "[A] judgment, based on findings sufficient to establish legal entitlement to the life sentence, amounts to an acquittal on the merits and, as such, bars any retrial of the appropriateness of the death penalty." Justice O'Connor's concurring in part and concurring in judgment opinion in *Sattazahn* reiterates this point as well as *Poland's* simple observation that a defendant is acquitted of the death penalty "when the sentencer 'decide[s] that the prosecution has not proved its case that the death penalty is appropriate.'" 537 U.S. at 117, 123 S.Ct. 732. That is what happened here.

In the capital sentencing phase of Brown's first trial, the Commonwealth had the burden of proving an aggravating circumstance and it successfully met that burden, with the jury finding that Bland's murder was committed while Brown was engaged in the commission of first-degree burglary and first-degree robbery. However, under the penalty phase instructions, as in *Eldred,* the jury was charged as follows: "If upon the whole case you have a reasonable doubt whether the Defendant should be sentenced to death, you shall instead fix his punishment at a sentence of imprisonment." [2] The Commonwealth did not prove its case on this second issue and the jury acquitted Brown of death under the double-jeopardy principles enunciated in *Bullington* and its progeny when they opted for one of the only other two options, *i.e.,* life imprisonment without the possibility of parole for twenty-five (25) years.

As the Commonwealth correctly notes, this result is contrary to our holdings in *Eldred,* and *Salinas,* which provide that

> [a]n "implied acquittal" of the death penalty occurs only where the jury or reviewing court affirmatively finds that the Commonwealth has failed to prove the *existence* of an aggravating circumstance. If the jury has found that evidence of an aggravating circumstance was proven beyond a reasonable doubt, but nonetheless imposes a sentence of less than death, the Commonwealth simply cannot be precluded on double jeopardy grounds from seeking the full range of penalties, including death, on retrial.

*Salinas,* 169 S.W.3d at 539. We have reconsidered that holding and are convinced post–*Sattazahn* that not only is it not the correct reading of *Bullington* and its progeny but, furthermore, it ignores the jury's finding, beyond a reasonable doubt, that death was not appropriate "upon the whole case" presented in the first trial.

*Eldred* and *Salinas* also fail to distinguish the fundamental difference between the death penalty, on the one hand, and any sentence of imprisonment, on the other. In *Salinas,* we reiterated the concern expressed in *Eldred* that

> [t]aken to its extreme, the implied acquittal theory results in any sentence being an implied acquittal of any higher sentence.... We reject any such outcome out of hand. Thus, had Eldred's jury returned a recommendation of 20 years' imprisonment, this recommenda-

2. Our standard capital-sentencing jury instructions have long admonished the jury with respect to reasonable doubt just as Brown's first jury was instructed: "If upon the whole case you have a reasonable doubt whether the Defendant should be sentenced to death, you shall instead fix his punishment at a sentence of imprisonment." *See,* Cooper and Cetrulo, *Kentucky Instructions to Juries, Criminal* § 12.08 5th ed. (2009). As Justice

Cunningham correctly notes in his concurring opinion, KRS 532.025 does not expressly require that the jury determine beyond a reasonable doubt that death is the appropriate sentence. Accordingly, a majority of this Court concludes that juries in capital cases should not receive the instruction set forth in § 12.08. To the extent *Parrish v. Commonwealth,* 121 S.W.3d 198 (2003) suggests otherwise, it is hereby overruled.

tion would not have been an implied acquittal of a term of years greater than 20 or an implied acquittal of life. Nor would it have been an implied acquittal of Life–25, even though a sentence of Life–25, like the death penalty, requires a written finding of the existence of a least one aggravating factor beyond a reasonable doubt.

*Salinas,* 169 S.W.3d at 538 (quoting from *Eldred,* 973 S.W.2d at 48). In fact, however, the death penalty is the *only* sentence in Kentucky for which jury instructions have routinely been given directing the jury to determine its propriety beyond a reasonable doubt.[3] The death penalty, moreover, is the only sentence the United States Supreme Court has held implicates double jeopardy concerns. There is no risk, therefore, that the *Green* implied acquittal theory might be "taken to an extreme" and applied so as to foreclose on retrial any sentence less severe than death.

In sum, the implicit finding in Brown's first trial that death was not appropriate, pursuant to a reasonable doubt instruction, amounted to an acquittal on the merits of that question and thus barred reconsideration of the death penalty at his retrial. To the extent that *Eldred* and *Salinas* hold otherwise, they are hereby overruled. Because Brown was impermissibly subjected to the death penalty at his retrial, we must reverse that portion of the Warren Circuit Court's judgment sentencing him to death and remand for new penalty proceedings.

## II. Ordinary Standards of Review Apply to What is Now a Non–Capital Case.

■ The fact that Brown was improperly sentenced to death and will not be subject to the death penalty on retrial

affects slightly our review of his contention that he was erroneously convicted. As this is no longer a capital case, Brown's other assertions of error will be reviewed under our ordinary standards of review. *Meadows v. Commonwealth,* 550 S.W.2d 511 (Ky.1977). In particular, preserved evidentiary and other non-constitutional errors will be deemed harmless under RCr 9.24 and *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) if we can say with fair assurance that the judgment was not substantially swayed by the error. Our inquiry is not simply "whether there was enough [evidence] to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* at 765, 66 S.Ct. 1239; *Winstead v. Commonwealth,* 283 S.W.3d 678 (Ky.2009). As to those preserved constitutional errors which are subject to harmless error review, they must be shown to be "harmless beyond a reasonable doubt" in order to be deemed harmless. *Id.* at 689 n. 1 (citing *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

■ Unpreserved errors will be reviewed under RCr 10.26, the substantial or palpable error rule, pursuant to which an unpreserved error justifies relief only if it is plain, clearly prejudicial, and rendered the proceedings manifestly unjust. *Commonwealth v. Jones,* 283 S.W.3d 665 (Ky. 2009). With these preliminaries stated, we turn to Brown's other assertions of error.

## III. Brown's Jury Was Properly Selected.

Brown contends that the trial court made several errors during the course of

3. As noted in footnote 2, a majority of the Court concludes the reasonable doubt instruction appearing at § 12.08, *Kentucky Instruc-* *tions to Juries, Criminal,* is not required by Kentucky law and should not be given in the future.

jury selection. He maintains that two venirepersons, A and B, should have been struck as biased in favor of the Commonwealth but were not. He maintains that two venirepersons, C and D, were improperly struck for cause on the ground that they were biased against the death penalty. He maintains that the trial court abused is discretion under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) when it upheld the Commonwealth's peremptory strike of an African American venireperson. And, finally, Brown maintains that the trial court abused its discretion when it dismissed from the venire an African–American panel member who arrived at the courthouse on the morning of general voir dire with alcohol on his breath and in his system.

 Jury selection in criminal cases in Kentucky is governed by RCr 9.30 through RCr 9.40 and Part Two of the Administrative Procedures of the Court of Justice. Under these provisions the trial court is vested with broad discretion to oversee the entire process, from summoning the venire to choosing the petit jury which actually hears and decides the case. *Fields v. Commonwealth*, 274 S.W.3d 375 (Ky.2008); *Soto v. Commonwealth*, 139 S.W.3d 827 (Ky.2004). Our review of the rulings Brown challenges is thus limited to determining whether the trial court abused that discretion, that is, whether the ruling can be characterized as arbitrary, unreasonable, or contrary to sound legal principles. *Commonwealth v. English*, 993 S.W.2d 941 (Ky.1999). Because none of the challenged rulings amounted to an abuse of the trial court's discretion, Brown is not entitled to relief on these grounds.

**A. The Trial Court Did Not Abuse its Discretion by Denying Brown's Motion to Strike For Cause Two Venirepersons on the Ground of Bias.**

 Under the Sixth and Fourteenth Amendments to the United States Constitution and Section 11 of the Kentucky Constitution, a criminal defendant is entitled to an impartial jury. To help protect that right, RCr 9.36 mandates that "[w]hen there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused as not qualified." In making this determination, the trial court is to consider the prospective juror's voir dire responses as well as his or her demeanor during the course of voir dire, and is to keep in mind that generally it is the totally of those circumstances and not the response to any single question that reveals impartiality or the lack of it. "Impartiality," we reiterated recently in *Shane v. Commonwealth*, 243 S.W.3d 336, 338 (Ky.2007), "is not a technical question but a state of mind." Indeed, notwithstanding a prospective juror's responses during voir dire, whatever his or her protestations of lack of bias, the juror's close relationship, "be it familial, financial or situational, with any of the parties, counsel, victims or witnesses," is sufficient to require the court "to sustain a challenge for cause and excuse the juror." *Marsch v. Commonwealth*, 743 S.W.2d 830, 833 (Ky.1988) (citing *Ward v. Commonwealth*, 695 S.W.2d 404 (Ky.1985); internal quotation marks omitted); *Montgomery v. Commonwealth*, 819 S.W.2d 713 (Ky.1991). This is so because however sincere and well-meaning such prospective jurors may be, such close personal relationships are apt "subconsciously [to] affect their decision in the case." *Marsch*, 743 S.W.2d at 834. *See also, Ratliff v. Commonwealth*, 194 S.W.3d 258 (Ky.2006) (collecting cases in which we have held that bias should have been presumed).

 It is this presumptive bias, Brown contends, that required prospective jurors

A and B to be excused. During individual voir dire, juror A acknowledged that she worked as a Bowling Green police officer and that her work brought her into contact with the. Warren County Commonwealth Attorney's office and the state police. She acknowledged further that she had worked previously as a federal law enforcement agent and had taught other agents investigation techniques as well as how to give testimony in court. Finally, she acknowledged that her father and her brother had both worked extensively in law enforcement, including service as Kentucky State Police troopers. In response to questioning by the court and both parties concerning her ability to assess the credibility of police officers as she would any other witness, she stated that she was well aware that police officers could testify falsely or mistakenly and that her training had impressed upon her the importance of treating an officer's testimony no differently than anyone else's. Arguing that juror A's personal and family connection with law enforcement rendered her implicitly biased in favor of the Commonwealth, Brown moved to have her struck for cause. The trial court denied the motion in light of the juror's evident awareness of the realities of police testimony and her manifest respect for fair proceedings. Brown then used a peremptory challenge to remove juror A. Brown contends that notwithstanding prospective juror A's protestations of impartiality, her manifold connections with law enforcement were apt subconsciously to make her favor the Commonwealth and its police officer witnesses. We disagree.

We have many times held that "the mere fact that a person is a current or former police officer is insufficient to warrant removal for cause.... Additional evidence of bias must be shown." *Mills v. Commonwealth*, 95 S.W.3d 838, 842 (Ky. 2003) (citing *Young v. Commonwealth*, 50 S.W.3d 148 (Ky.2001)). Similarly, we have held that a close relationship to a police officer does not, standing alone, give rise to a presumptive bias. *Penman v. Commonwealth*, 194 S.W.3d 237 (Ky.2006) (wife of former officer). We have required, rather, such additional evidence of bias as the prospective juror's personal acquaintance with the officers involved in the investigation of the case being tried, or his assertion during voir dire that police officers are less apt than other witnesses to lie because they take their oaths more seriously. *Shane, supra.*

Here there is no such additional evidence of bias. Prospective juror A had no personal acquaintanceship or relation with the Adair County Commonwealth Attorney who tried this case, or with any of the police officers who investigated it or were to testify in it. Nor did prospective juror A betray any tendency to lend heightened credence to police testimony. On the contrary, she frankly acknowledged that police officers could lie or be mistaken and expressed a very clear awareness of the jury's responsibility to consider all the testimony impartially. The trial court did not abuse its discretion by ruling that prospective juror A was not disqualified merely by the facts that she worked as a police officer and was related to other officers.

■■■ At the close of prospective juror B's individual voir dire examination, she advised the court that about a year previously she had been the victim of a burglary. Her house had been broken into when no one was home, and various household items had been stolen. Although she had been only marginally involved in the subsequent investigation, she was aware that two individuals had been charged with the offense, that one of them had already been sentenced, and that the other was awaiting sentencing. In response to questions about the effect of this incident on her

ability not to pre-judge Brown, who was alleged to have committed a burglary, she stated that her own experience would not color her judgment and that she understood that Brown's case was to be decided solely on the basis of the evidence presented during trial. Brown moved to have prospective juror B struck on the ground that as a victim of a crime similar to one of the alleged crimes, she was apt to harbor a subconscious bias against him. Again, relying on prospective juror B's demeanor, her candor in volunteering the information about her personal experience, and her answers to the questions put to her, the trial court denied the motion. As with juror A, Brown used a peremptory challenge to remove juror B.

 The trial court's decision was not an abuse of discretion. As with police officers, the mere fact that a prospective juror has been the victim of a crime similar to the crime being tried does not by itself imply a disqualifying bias. Additional evidence of bias is required. *Woodall v. Commonwealth,* 63 S.W.3d 104 (Ky.2001); *Hodge v. Commonwealth,* 17 S.W.3d 824 (Ky.2000); *Sanders v. Commonwealth,* 801 S.W.2d 665 (Ky. 1990). Obvious factors bearing on the likelihood of bias are the similarity between the crimes, the length of time since the prospective juror's experience, and the degree of trauma the prospective juror suffered. It is the totality of all the circumstances, however, and the prospective juror's responses that must inform the trial court's ruling. Here, a year had passed since prospective juror

B's relatively non-traumatic experience, circumstances lending credence to her unhesitating assertion that she could base her decision in Brown's case on the evidence presented. Given those facts and the absence of any countervailing evidence, the trial court did not abuse its discretion by refusing to strike prospective juror B. Finally, even if the trial court had abused its discretion with respect to these two jurors, it is doubtful that Brown would be entitled to relief. The trial court gave Brown extra peremptory challenges (a total of fourteen) but allowed the Commonwealth only the nine peremptory challenges required by RCr 9.40. Whether a defendant's receipt of "extra" challenges not accorded to the Commonwealth avoids the deprivation of a substantial right discussed in *Shane, supra,* is a question best left for another case where it is potentially dispositive.[4]

**B. The Trial Court Did Not Abuse its Discretion When it Struck Two Venirepersons as Biased Against the Death Penalty.**

 Brown next contends that the trial court improperly struck two venirepersons, prospective jurors C and D, on the ground that because of their reservations concerning the death penalty they could not give due consideration to the full range of potential sentences to which Brown was subject. As the parties correctly note, the United States Supreme Court recently reviewed its precedents in this area and found them to establish at least the following four principles:

---

4. "To shortchange a defendant in this manner (failing to grant a proper for cause strike) is to effectively give the Commonwealth more peremptory challenges than the defendant." *Shane,* 243 S.W.3d at 339. Although we need not decide whether the change applies retroactively to this case, we should also note that *Shane* has been modified by *Gabbard v. Com-* *monwealth,* 297 S.W.3d 844, 854 (Ky.2009), which now clarifies that the defendant must identify jurors who would have been challenged and removed if the defendant had not been required to use a peremptory challenge on the juror(s) who the trial court erroneously failed to strike for cause.

First, a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause.... Second, the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.... Third, to balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause, but if the juror is not substantially impaired, removal for cause is impermissible.... Fourth, in determining whether the removal of a potential juror would vindicate the State's interest without violating the defendant's right, the trial court makes a judgment based in part on the demeanor of the juror, a judgment owed deference by reviewing courts.

*Uttecht v. Brown,* 551 U.S. 1, 9, 127 S.Ct. 2218, 167 L.Ed.2d 1014 (2007) (citations omitted). The distinction the trial court must make under these principles is not the simple one between potential jurors who oppose and those who favor capital punishment. It is the much more difficult distinction between potential jurors whose opposition to, or whose reservations about, capital punishment would "prevent or substantially impair the performance of [their] duties as ... juror[s] in accordance with [their] instructions and [their] oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) (citation and internal quotation marks omitted), and potential jurors whose reservations about capital punishment are as serious, perhaps, but who are capable, nevertheless, of considering capital punishment in circumstances where the General Assembly has deemed it an appropriate potential sentence. Both kinds of potential jurors are apt to respond equivocally to voir dire questions about their ability to consider

capital punishment—"I don't know." "It depends." "That would be hard."—and it is the trial court's difficult task to distinguish between potential jurors whose equivocation reflects merely careful thinking and a strong sense of responsibility in the face of such an important decision and those jurors whose equivocation signals an impaired ability to abide by the jury instructions and to give to capital punishment the consideration Kentucky law requires. Because this distinction will often be anything but clear and will hinge to a large extent on the trial court's estimate of the potential juror's demeanor, the decision is one particularly within the trial court's discretion and is subject to reversal on appeal only for an abuse thereof. *Uttecht, supra.*

■ Potential juror C conceded during voir dire that she would have trouble considering the death penalty. In response to questions by defense counsel, she stated that she was not categorically opposed to capital punishment and could imagine circumstances in which she would favor it, but she made clear, nevertheless, that those circumstances would be extreme and that even having heard all the evidence she would find the death penalty hard to consider. Brown maintains that the trial court abused its discretion when it struck potential juror C for cause, because she stated that she would not rule out capital punishment per se. As noted, however, the standard is not whether the potential juror would never consider capital punishment, but whether her reservations about it are such as to "substantially impair" her ability to consider it. Juror C candidly acknowledged that in all but the most extreme cases she would find the death penalty "hard to consider." The trial court could reasonably find such a limited ability to consider capital punishment "substantial impairment," and thus it did not abuse its

discretion by striking potential juror C for cause.

■ Potential juror D presents a somewhat more difficult case. When the court initially asked whether he could consider the death penalty, potential juror D responded that he did not know, that capital punishment would be a hard decision, and that he could not know how he would decide until presented with all the facts. He repeated, "I don't know," several times when asked if he could consider the death penalty. He also made clear, however, that he was not opposed to the death penalty, per se, and three times stated that the evidence might be such that there would be "no problem" with imposing it. Given these equivocal responses, the Commonwealth attempted to pin potential juror D down by asking him whether he could sign the death verdict were the jury to decide on capital punishment and were he to be elected the jury's foreperson. Juror D replied that signing the verdict would be "tough," that he would not volunteer for that role, and that he hoped he would not be put in that position. He did not say, however, that he would refuse to sign the verdict or that that was something he would not be able to do.

In striking juror D for cause, the trial court referred to his reluctance to sign the verdict, but focused primarily on his repeated uncertainty as to whether he could consider the death penalty. In the court's view, that uncertainty disqualified potential juror D. Brown contends that the Commonwealth's question regarding whether potential juror D could sign a death verdict was improper, since it deviates from the United States Supreme Court's carefully balanced standard for assessing juror qualification in this area. The trial court abused its discretion, Brown maintains, by allowing that question and by taking potential juror D's re-

sponse into consideration. The trial court also abused its discretion, Brown contends, by striking potential juror D. In Brown's view, when potential juror D said that he did not know whether he could consider the death penalty, he meant only that it was a weighty decision which he would not know how to make until he had heard the evidence, the sort of serious but open-minded response that the Supreme Court has indicated does not conflict with the State's interest in a jury capable of dutifully following its instructions and abiding by its oath.

Again, we are convinced that the trial court did not abuse its discretion. We agree with Brown that there is nothing talismanic about the Commonwealth's jury foreman/death verdict question. The standard for disqualifying a potential juror is whether the juror's views substantially impair his or her ability to consider capital punishment in circumstances where the General Assembly has allowed for it. Jurors are under no duty to serve as foreperson, and a potential juror's discomfort with that role, especially when confronted with it out-of-the-blue during voir dire, sheds little light on the question of his or her ability to consider capital punishment. Here, for example, potential juror D's responses that he would find the foreperson role "tough" and would not volunteer for it, added little to the responses he had already given when asked directly if he could consider the death penalty. The trial court appropriately gave the foreperson/death verdict questions little weight.

The trial court did not, however, abuse its discretion by allowing those questions. In addition to identifying potential jurors who, for one reason or another, are disqualified, voir dire is meant to assist the parties identify those potential jurors to be struck peremptorily. The trial court has

broad discretion in allowing or limiting such questioning. *Fields,* 274 S.W.3d at 392–93. The Commonwealth's foreperson questions, which were not calculated to elicit a potential juror's commitment to some specific view of the evidence, were well within that discretion.

Nor did the trial court abuse its discretion by striking potential juror D for cause. Although Brown's interpretation of potential juror D's uncertainty about his ability to consider the death penalty is plausible, that is, that it was merely the caution of a responsible person unsure until he had heard the evidence whether capital punishment should be imposed, the question is not whether Brown's interpretation is reasonable but rather whether the trial court's interpretation was unreasonable. It was not.

Potential juror D indicated that the question of capital punishment was for him exceedingly morally fraught and that he would not know until actually confronted with the decision how his feelings would sort themselves out. Although he may have meant, as Brown contends and as some of potential juror D's statements suggest, that his hesitation did not concern capital punishment itself but only its propriety under the facts of the case, he also made statements suggesting that, when faced with the actual decision, he might find capital punishment too enormous a penalty even to consider. In response to one of the Commonwealth's questions, for example, he agreed that his ability to consider the death penalty was "impaired." At another point when asked if he could consider it, he said, "I don't know. I might have a problem or I might not." And, as noted above, virtually every time he was asked directly whether he could consider the death penalty, he said, "I don't know." Thus, although potential juror D's responses were equivocal and am-

biguous, they could lead a reasonable person to conclude that he was substantially impaired in his ability to consider the death penalty. The trial court cannot be said, therefore, to have abused its discretion in making that determination.

Indeed, as the United States Supreme Court emphasized in *Uttecht, supra,* assessing the potential juror's demeanor plays an important role in determining the potential juror's qualification, and this is especially so where the potential juror equivocates as earnestly as did potential juror D. The trial court is in the best position to make that assessment, of course, which is another reason in close cases such as this one to defer to that court's judgment.

**C. The Trial Court Did Not Violate *Batson* When it Upheld the Peremptory Strike of an African–American Venireperson.**

Brown next contends that the jury selection process was tainted and his Fourteenth Amendment right to equal protection violated when the Commonwealth used one of its peremptory strikes to excuse a potential juror, juror E, on the basis of her race. Brown, who is an African–American, was accused of murdering a Caucasian woman. Following the removal of potential jurors for cause, there remained a venire of forty individuals, four of whom where African–Americans. The defense used a peremptory challenge as to one of those African–Americans; the prosecution used a peremptory challenge as to one; one of the African–Americans was removed by lot; and one served on the jury that ultimately sentenced Brown to death. In response to the prosecution's peremptory challenge, Brown, citing *Batson v. Kentucky, supra,* asserted that the strike was discriminatory and moved for a hearing at which the Commonwealth would be required to proffer a race-neutral rea-

son for removing one of the African–American venirepersons.

As is now familiar, *Batson* provides a three-step process whereby trial courts are to adjudicate claims that peremptory juror challenges were based on race:

> First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race[; s]econd, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question[; and t]hird, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana,* 552 U.S. 472, 476–77, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008) (citations and internal quotation marks omitted). At the first stage, the opponent of the strike need only show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California,* 545 U.S. 162, 168, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005) (citation and internal quotation marks omitted). If that showing is made, the burden then shifts to the strike's proponent to present a race-neutral explanation for removing the juror in question. "Although the prosecutor must present a comprehensible reason, the second step of this process does not demand an explanation that is persuasive, or even plausible; so long as the reason is not inherently discriminatory, it suffices." *Rice v. Collins,* 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (citations and internal quotation marks omitted). The proponent having articulated a non-invidious reason for the strike, "the question presented at the third stage of the *Batson* inquiry is whether the defendant [the strike's opponent] has shown purposeful discrimination." *Snyder,* 552 U.S. at 484–85, 128 S.Ct. 1203. In making that determination, the trial court is to consult "all of the circumstances that bear upon the issue of racial animosity," *Snyder,* 552 U.S. at 478, 128 S.Ct. 1203, including the proponent's demeanor in explaining the strike, the inherent plausibility of that explanation, inconsistencies in the treatment of the stricken juror and similarly situated jurors outside the suspect class, and any history the proponent may have of using peremptory challenges invidiously. *Snyder, supra; Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). Whether the proponent discriminated is a question of fact, and we review the trial court's ultimate finding under the clearly erroneous standard. *Johnson, supra.* Reviewing courts have also been enjoined, however, to consult "all the circumstances" bearing upon racial animosity, notwithstanding the fact that "a retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial." *Snyder,* 552 U.S. at 483, 128 S.Ct. 1203.

Here, Brown purported to meet his prima facie burden by noting merely the racial circumstances of the alleged crime and the fact that the prosecutor had struck one of the four remaining African–American venirepersons. His argument, in essence, was that any strike of an African–American venireperson gives rise to an inference of discrimination if the defendant is African–American. In response, the Commonwealth noted that the defense, too, had struck one of the African–American panel members, and asserted that his peremptory challenge of only one of the four did not constitute prima facie evidence of discrimination. In addition, he explained that potential juror E had expressed serious misgivings about the death penalty, stating that she did not want that type of responsibility and probably could not sign a death verdict. The Commonwealth reminded

the court that it had moved to have potential juror E struck for cause, and that in denying the motion—juror E stated that despite her misgivings she could consider the death penalty for a sufficiently serious crime—the trial court had referred the Commonwealth to its peremptory challenges. Brown adduced no other circumstances tending to suggest that the Commonwealth's explanation was pretextual or that its strike of juror E was discriminatory, and the court not only found in the Commonwealth's favor on the discrimination question, but ruled that Brown had failed even to meet his prima facie burden.

On appeal, Brown invites us, as he did not invite the trial court, to compare the strike of potential juror E with the Commonwealth's treatment of several white panel members who also expressed reservations about the death penalty, but whom the Commonwealth did not strike. Two of these other potential jurors in particular elicited unsuccessful motions for for-cause strikes, but were not then struck peremptorily, as was juror E. Although these additional facts could reasonably be thought to give rise to an inference of discrimination, and thus would likely have satisfied Brown's prima facie burden, in the circumstances of this case we are not convinced that they compel a finding of discrimination. In the first place, Brown's failure to adduce these comparisons at trial denied the Commonwealth an opportunity to provide racially neutral explanations for them. There are, after all, non-racial differences between juror E and the jurors the Commonwealth did not strike that may, from the Commonwealth's point of view, have been telling. Both of the other panel members who elicited for-cause motions, for example, answered the Commonwealth's voir dire question about signing the death verdict by saying that although they would find it difficult they could do that. Potential juror E, on the other hand,

stated that she doubted that she could sign a death verdict. Her response could have made juror E stand out in the Commonwealth's mind as someone particularly likely to thwart its efforts to secure a death sentence.

Moreover, although in *Snyder* and *Miller–El* the Supreme Court noted that a prosecutor's inconsistent treatment of similarly situated venirepersons can be an important factor in identifying a discriminatory peremptory strike, in those cases the disparate treatment was clear and was only one factor among others tending to suggest discrimination. The prosecutors in those cases struck all or nearly all of the African–American panel members, and in both cases their explanations for at least some of the strikes were highly implausible. Here, on the other hand, it is not clear from the undeveloped record that juror E was treated disparately, the Commonwealth did not seek to remove a high proportion of the African–American panel members, and its explanation for the strike of juror E—her serious reservations about the death penalty—was entirely plausible. In these circumstances we cannot say that the trial court clearly erred by finding the peremptory challenge of potential juror E non-discriminatory, and this is so even in light of the comparisons with other panel members that Brown did not give the trial court an opportunity to consider.

## D. The Trial Court Did Not Abuse its Discretion by Dismissing a Venireperson Who Reported For Duty Smelling Strongly of Alcohol.

 Finally with respect to the selection of the jury, Brown contends that the trial court abused its discretion when it dismissed potential juror F from the venire. On the morning that group voir dire was to begin, after several days of individual voir dire, a bailiff reported to the court

that potential juror F "reeked" of alcohol. The court informed the parties, and in their presence questioned potential juror F. The juror denied having consumed any alcohol that morning, but admitted having drunk some beer the previous night. He was given a breath test, which registered 0.037, a breath-alcohol concentration not strongly indicative of alcohol intoxication. *Cf.* KRS 189A.010 (for the purposes of the DUI laws, a person with a breath-alcohol concentration less than 0.05 is presumed not to be under the influence of alcohol.). A bailiff testified, however, that while he was leading juror F from the court house to the jail to administer the breath test, he observed juror F having difficulty following directions. He also observed juror F's eyes at close range and saw that they were dilated. In the bailiffs' opinion, juror F was under the influence of something, if not alcohol then something else.

Because juror F's breath test did not establish that he had consumed alcohol that morning, the court did not hold him in contempt. It did, however, dismiss juror F from the venire, explaining that in its view a potential juror's appearance in court with a strong odor of alcohol on his breath manifested so pronounced a lack of respect for the court and its processes and such a high degree of unreliability as to render the juror unqualified for service. Brown objected to the dismissal. Although counsel noted that potential juror F was an African–American, he disavowed in the next breath any suggestion that the dismissal was racially motivated. He objected to the dismissal, however, because juror F's breath test did not establish that juror F was under the influence of alcohol or that he had broken any law. On appeal, Brown attempts to characterize juror F's dismissal as "troubling" because of juror F's race, but as noted trial counsel expressly waived any claim that the dismissal had to do with race.

Nor did the trial court abuse its discretion by dismissing potential juror F. Part II of the Administrative Procedures of the Court of Justice concerns jury selection and management. Section 17 of that Part authorizes the trial court to hold in contempt any potential juror "who fails to give attention at court, or . . . who otherwise fails to complete jury service." This section confers upon the trial court discretion to manage the jury selection process and to punish by holding in contempt jurors who interfere with that process through lack of attention or otherwise. This discretion includes the authority to impose the lesser sanction of dismissal for serious breaches of the court's decorum where, as here, the breach raises significant concerns that the potential juror cannot be relied upon to serve attentively and non-disruptively. Juror F's appearance in court smelling strongly of alcohol, his dilated eyes, and his apparent disorientation while being led to the jail raised such concerns and justified the trial court's decision to dismiss him from the venire. There was no abuse of discretion.

## IV. The Trial Court Committed No Reversible Evidentiary Errors.

We turn next to Brown's numerous claims of evidentiary error. As errors of admission, he challenges the Commonwealth's use of his testimony from the previous trial, its DNA evidence, its cross-examination of him concerning his numerous tattoos, its use of depictions of the crime scene and of autopsy photographs, and its introduction of hearsay statements during the testimonies of Stephanie McClain and Jerry Kemp. He contends that the trial court erred by excluding evidence of a note written to Bland shortly before her death, by limiting the cross-examination of Bland's boyfriend, and by excluding evidence that Jerry and Joseph

Kemp were involved in the theft of a television from another woman about a year after Bland's murder. We review a trial court's evidentiary rulings for abuse of discretion, *Walker v. Commonwealth,* 288 S.W.3d 729 (Ky.2009), and subject to the harmless and palpable error rules discussed above.

**A. The Trial Court Did Not Abuse its Discretion by Admitting Brown's Testimony From His First Trial. The Court's Failure to Redact Hearsay Portions of that Testimony Was Error but Harmless.**

As noted above, during its case-in-chief the Commonwealth moved to play for the jury the video recording of Brown's testimony during his first trial. In that testimony Brown admitted being familiar with Bland's residence because one of his aunts had lived there; that he was unemployed in January 2000; and that he could not account for his whereabouts during the nights of January 10, 11, and 12, the period in which the murder occurred. And, as noted above, he admitted having falsely accused the Kemp brothers of being involved in the crime. Defense counsel objected on the ground that the recording would amount to compelled testimony in violation of Brown's Fifth Amendment privilege not to testify against himself. Counsel also argued both that the recording was unduly prejudicial, because it made apparent the fact that Brown had previously stood trial, and also that portions of the recording were irrelevant or unduly prejudicial, because they referred to witnesses and testimony presented at the first trial but not at the second. When the trial court indicated that in its view the

Fifth Amendment did not bar the recording, counsel moved to have the allegedly prejudicial and irrelevant portions redacted. The court denied that motion and permitted the Commonwealth to play the recording of Brown's prior testimony in its entirety. Brown maintains that the trial court erred by refusing to limit the Commonwealth's use of the recording to rebuttal and by refusing to redact twelve references to the prior trial, three references Brown made to having been incarcerated, and three references to witnesses who either did not testify at Brown's second trial at all or who did not testify at the second trial about an incident raised at the first trial.[5] Although we agree with Brown that the trial court erred by refusing to redact portions of Brown's prior testimony, we are convinced that the error was harmless.

**1. Brown's Prior Testimony Was Not Barred Either by the Constitution or by the Rule Against Hearsay.**

As the Commonwealth correctly notes, in *Harrison v. United States,* 392 U.S. 219, 222, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), the United States Supreme Court recognized the "general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings." The Court explained that "[a] defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him." *Id.* Numer-

---

**5.** Although Brown sought redaction of the other matters about which he complains on appeal, he did not seek redaction of the references to Cheryl Haskins's hearsay statements discussed *infra.*

ous federal and state decisions support, reiterate, and develop that rule. *See, e.g., United States v. Duchi,* 944 F.2d 391 (8th Cir.1991); *United States v. Mortensen,* 860 F.2d 948 (9th Cir.1988); *United States v. Bohle,* 475 F.2d 872 (2nd Cir.1973); *State v. Low,* 192 P.3d 867 (Utah 2008); *State v. McCoy,* 692 N.W.2d 6 (Iowa 2005); *State v. Castonguay,* 218 Conn. 486, 590 A.2d 901 (1991). *See also,* W.E. Shipley, Use in Subsequent Prosecution of Self-incriminating Testimony Given Without Invoking Privilege, 5 A.L.R.2d 1404 (1949 of 1977 Supp.). These cases reflect that unless a defendant's prior testimony was unconstitutionally compelled, that testimony may be introduced as substantive evidence against the defendant at a subsequent trial without running afoul of the constitutional privilege against self-incrimination.

Our law has long been in accord. *Bess v. Commonwealth,* 118 Ky. 858, 82 S.W. 576 (1904). In *Sherley v. Commonwealth,* 889 S.W.2d 794, 798 (Ky.1994), we noted that "[o]nce the defendant decides to ... testify in open court, he waives his Fifth Amendment privilege. There was nothing improper about introducing the prior testimony at the second trial." The substantive use of Brown's first-trial testimony was not precluded, therefore, by the Fifth Amendment.

▬ Nor was Brown's first-trial testimony precluded by the rule against hearsay. KRE 801A(b)(1) provides that "[a] statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is: ... The party's own statement, in either an individual or a representative capacity." Brown's own first-trial statements could thus be used against him notwithstanding the fact that they were hearsay.

## 2. The Use of Brown's Prior Testimony Was Subject to the Rules of Relevance and While Redactions Should Have Been Made, Any Violation of the Relevance Rules Was Harmless.

▬ As Brown correctly notes, however, the fact that his first-trial testimony was not excluded either by the Constitution or by the hearsay rules does not mean that it was admissible. The recording of Brown's previous testimony, like all other evidence, was still subject to the rules of relevance, under which irrelevant evidence is not to be admitted, KRE 402, and relevant evidence may be excluded if, among other reasons, it is so unduly prejudicial that its prejudicial effect substantially outweighs its probative value. KRE 403. *See Aliotta v. National Railroad Passenger Corp.,* 315 F.3d 756, 763 (7th Cir.2003) (Rule 403 "clearly applies" to party-opponent admissions.); *Williams v. Drake,* 146 F.3d 44, 48 (1st Cir.1998) ("Even an admission by a party-opponent is subject to exclusion under Rule 403."); *LaSota v. Corcoran,* 119 Ariz. 573, 583 P.2d 229, 238 (1978) ("'[F]ormer testimony' must also meet the tests of relevancy and absence of overriding prejudice."). We agree with Brown, therefore, that the trial court erred by failing to subject Brown's first-trial examination and testimony to the rigors of the relevance rules. We are convinced, however, that the error was harmless.

We reject, first, Brown's contention that the first-trial evidence was to be sanitized of all reference to the fact that Brown had been tried before. He has cited no case in which such a rule was discussed, much less applied. Instead, he refers us to two cases, one a pretrial publicity case and the other a jury instruction case, in which the jury or members thereof were expressly informed that the defendant had previously been convicted of the current charge and was being retried as a result of evi-

dentiary error.[6] In both cases the court held that expressly informing the jury that another jury had found the defendant guilty of the present charge was so inherently prejudicial as to amount to reversible error. We need not decide how we would address such a case, for the situation before us is significantly different. Brown does not contend that his second jury was informed of either his prior conviction or the reason for his retrial. Absent such an express invasion of the jury's independence, the fact that the jury may have been aware that Brown was being retried no more infringed upon his right to be presumed innocent than does the jury's awareness that the defendant was arrested, indicted, and put on trial. *Hodge v. Commonwealth,* 17 S.W.3d 824 (Ky.2000) (citing *Tamme v. Commonwealth,* 973 S.W.2d 13 (Ky.1998)) (no presumption of prejudice arises from the mere mention of a prior trial where the jury was not informed of prior conviction and sentence.). As we observed in *Romans v. Commonwealth,* 547 S.W.2d 128 (Ky.1977), there is no doubt that a defendant is prejudiced to some extent by the mere facts that he has been indicted and brought to trial. That prejudice is neither unreasonable nor unfair, however, and does not provide a basis for relief, because it is an inevitable part of the criminal process.

Likewise, when a defendant succeeds in having his conviction overturned and his case retried, it is very likely, if not inevitable, that the fact of retrial will in some way be brought to the jury's attention. In this case, for example, one of the first-trial witnesses, Katherine Williams, was unavailable at the time of the second trial, and the video recording of her testimony was played in its entirety by agreement of the parties. Even had the express references to the jury been redacted from Brown's recorded testimony, moreover, the second jury was sure to have realized that he had been tried previously from his appearing on the witness stand and from the nature of the questions put to him. Any consequence so inherently a part of the criminal process, even if some element of prejudice attaches to it, cannot provide grounds for relief because the prejudice cannot be deemed unfair or unreasonable. *Cf. State v. Cook,* 281 Kan. 961, 135 P.3d 1147, 1158 (2006) (jurors' awareness "of a previous conviction for the same crime is not inherently prejudicial."); *State v. Albert,* 381 So.2d 424, 428 (La.1980) (prosecutor's reference to prior trial but not to conviction did not necessitate a mistrial.). Although the trial court would certainly have been within its discretion had it granted Brown's motion to redact his prior testimony so as to minimize reference to the first trial, its refusal to do so was no less within its discretion. Had Brown wished to ensure that the jury did not use the fact of his prior trial against him, he could have requested an admonition to that effect. Absent such a request, the trial court's refusal to redact jury references from Brown's first-trial testimony does not entitle Brown to relief.

We also reject Brown's contention that three references he made during his first-trial testimony to having been incarcerated should have been redacted pursuant to KRE 404(b), the rule that generally excludes evidence of other crimes, wrongs, or acts when offered as mere character evidence. We need not decide the applicability of the rule, for even if the incarceration references should have been redacted, the trial court's refusal to do so was clearly

---

**6.** *United States v. Williams,* 568 F.2d 464 (5th Cir.1978); *Arthur v. Bordenkircher,* 715 F.2d 118 (4th Cir.1983).

harmless. As Brown himself testified during his direct examination, he is and was at the time of trial a convicted felon, a fact the Commonwealth was entitled to elicit. That he had been incarcerated, therefore, added very little to what the jury learned anyway, and did not, we are convinced in light of the entire case, substantially sway its judgment. *Winstead, supra* (citing *Kotteakos,* 328 U.S. at 765, 66 S.Ct. 1239).

We agree with Brown, finally, that the trial court erred when it failed to redact portions of his first-trial testimony in which he was asked about matters not in evidence at the second trial. Brown identifies three such instances during his first-trial examination. We may illustrate the problem with this evidence by discussing one of them. At Brown's first trial, the Commonwealth offered testimony from Cheryl Haskins, a woman who lived with a third Kemp brother or half-brother, Rashad Slater, in the same apartment complex as Jerry Kemp, to whom Brown delivered the television set. Haskins testified that after Brown delivered the television set he spent the night with her and told her that the television was a Christmas present from him, Brown, to the Kemps. During Brown's direct examination at his first trial, counsel paraphrased Haskins's testimony and asked Brown to comment. He denied having given a television to the Kemps or having said that he had to Cheryl Haskins. During Brown's first-trial cross-examination the prosecutor also referred to Haskins's testimony and asked Brown whether he knew of any motive Haskins might have to lie. Brown replied that Haskins was aligned with the Kemps.

The problem here is that, whereas at the first trial the jury heard Haskins's own testimony, which the attorneys could then cross-examine and comment upon, at the second trial the evidence the jury heard about Haskins came not from her or from any other second-trial witness, but from the attorneys' questions on the recording, which in effect introduced Haskins's hearsay statements. KRE 804(b)(1) excepts from the hearsay rule "[t]estimony given as a witness at another hearing of the same or a different proceeding," but only if "the declarant is unavailable as a witness," and "the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." The burden of establishing these conditions rests with the proponent of the evidence, *St. Clair v. Commonwealth,* 140 S.W.3d 510 (Ky.2004), and here the Commonwealth made no attempt to show that Haskins was unavailable to testify. Even had that burden been met, moreover, the proper method for introducing Haskins's former testimony would have been to replay it for the jury, not to introduce counsels' summaries of it during their examination of Brown. While this was a violation of the hearsay rule, Brown did not draw it to the trial court's attention by requesting redaction and it does not approach palpable error.

The same hearsay error occurred with respect to first-trial testimony by Joseph Kemp and Eddie Ingram to the effect that Brown had threatened them at about the time that the police seemed to be focusing their attention on Brown. That evidence was not presented at the second trial, and again the jury learned of it only when Brown's first-trial testimony was replayed and the attorneys mentioned it during their examinations of him. Although these portions of Brown's first-trial testimony should have been redacted, we find the error harmless.

As noted above, at Brown's second trial Jerry Kemp, Charlene Palmer, and Barbara Slater all testified that Brown had delivered to Kemp and Palmer a television

similar to the one stolen from Bland's residence. They also testified that Brown disposed of the television when it appeared that the police had connected it to Bland's murder. Haskins's claim that Brown told her the set was a gift to the Kemps was merely cumulative of that testimony and was neither so damning nor so sensational on its own that it could have swayed the jury's findings. Also, as Brown notes, in the course of his first-trial testimony Brown was revealed to have had an affair with Haskins. At the second trial, Brown testified that he had fathered a child as a result of a casual relationship with a woman he saw for only a couple of months. Thus, his sexual relationship with Haskins is not likely to have influenced much the jury's impression of his character or on its own to have affected the jury's decision.

 Similarly, the improper evidence that Brown threatened Eddie Ingram and Joseph Kemp was cumulative of Lane's testimony quoting Brown as saying that he "might be fine if people would quit talking," and the alleged threats were not such that on their own they would have swayed the jury. Brown was alleged to have verbally threatened Ingram and to have thrown a basketball at Kemp. That evidence is not likely to have aroused the jury's passions against Brown or to have seemed so probative as to bear significantly on the judgment. In any event, Eddie Ingram testified in the second trial and was available for cross-examination on this issue. In sum, although the trial court erred when it refused to apply the rules of relevance to the recording of Brown's first-trial testimony and to redact portions of that testimony, the error was harmless and thus does not entitle Brown to relief.

**B. The Trial Court Did Not Abuse its Discretion by Admitting the Commonwealth's DNA Evidence.**

Brown next challenges the Commonwealth's DNA evidence, an issue which, with one exception regarding statistical matters discussed below, was not preserved at trial and which is now reviewable, again with the exception of the one preserved statistical issue, only for palpable error, RCr 10.26. Although Brown does not address the DNA issue extensively, we examine it in some detail because unreliable DNA evidence would be clearly prejudicial and would have rendered Brown's trial manifestly unjust.

As noted above, the state's forensic examiners isolated what the DNA analyst characterized as a mixed DNA sample from the non-bloody end of the tire iron used to kill Sherry Bland. The analyst testified that one of the contributors to the sample was male and that both Sherry Bland and Brown were potential contributors. The analyst further testified that the odds of choosing a potential contributor at random from the United States population were about 1 in 40,000. Brown contends that the analyst's results in this case were insufficiently probative to be admitted into evidence, and that even if the results were admissible the Commonwealth exaggerated their significance in a manner calculated to mislead the jury when it introduced Adair County census data meant to suggest that the county's population was too small to allow for a potential contributor other than Brown. Brown concedes that his first contention regarding the admissibility of the DNA analysis was not preserved.[7] He did object at trial to the admission of the census data. Notwithstanding that objection, the Common-

7. Brown did not challenge the reliability or admissibility of the DNA evidence at either his first or second trial.

wealth maintains that because Brown did not raise either issue in his first appeal, the admissibility of the DNA evidence and the census data has become the "law of the case," and is not now subject to review. Our discussion of these issues, therefore, begins with a consideration of the related doctrines of "law of the case" and "waiver."

### 1. The Law–Of–The–Case Doctrine Applies Only to Questions Actually Decided.

 "Law of the case" refers to a handful of related rules giving substance to the general principle that a court addressing later phases of a lawsuit should not reopen questions decided by that court or by a higher court during earlier phases of the litigation. 18B Wright, Miller, and Cooper, *Federal Practice and Procedure*, § 4478 (2002). One of the rules, for example, the so-called mandate rule, provides that on remand from a higher court a lower court must obey and give effect to the higher court's express or necessarily implied holdings and instructions. *Id. Buckley v. Wilson*, 177 S.W.3d 778 (Ky. 2005). Where multiple appeals occur in the course of litigation, another law-of-the-case rule provides that issues decided in earlier appeals should not be revisited in subsequent ones. Wright, Miller, and Cooper, *supra; Inman v. Inman*, 648 S.W.2d 847 (Ky.1982). These rules serve the important interest litigants have in finality, by guarding against the endless reopening of already decided questions, and the equally important interest courts have in judicial economy, by preventing the drain on judicial resources that would result if previous decisions were routinely subject to reconsideration.

 Law of the case is a prudential doctrine, however, not a jurisdictional one. "Law of the case directs a court's discre-

tion, it does not limit the tribunal's power." *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983); *Sherley v. Commonwealth*, 889 S.W.2d 794 (Ky.1994). As such, the doctrine is subject to exceptions. A court is not bound by the doctrine, for example, where there has been an intervening change in the law. *Id.* An appellate court, moreover, may deviate from the doctrine if its previous decision was "clearly erroneous and would work a manifest injustice." *Arizona v. California*, 460 U.S. at 618 n. 8, 103 S.Ct. 1382.

 Although in general the law-of-the-case doctrine applies only to matters the merits of which an appellate court has decided, *Davis v. Island Creek Coal Company*, 969 S.W.2d 712 (Ky.1998), an extension of the core law-of-the-case doctrine is the rule that precludes an appellate court from reviewing not just prior appellate rulings, but decisions of the trial court which could have been but were not challenged in a prior appeal. In *Commonwealth v. Schaefer*, 639 S.W.2d 776, 777 (Ky.1982), this Court held that an appellate court "has no power on a second appeal to correct an error in the original judgment which either was, or might have been relied upon in the first appeal." In addition to inaccurately characterizing the law of the case as a limitation of the appellate court's "power" as opposed to a prudential restraint on its discretion, *Schaefer* also mischaracterized this extension of the doctrine as part of the law-of-the-case doctrine. Unlike the core law-of-the-case doctrine, however, this extension barring issues not raised in a prior appeal is more accurately understood as a type of waiver. This is so because the extension hinges not on a previous appellate decision on the barred issue establishing the law of the case, but instead on the party's inaction in failing to raise the issue in a manner consistent with the court's general policy

against piecemeal appeals. *Crocker v. Piedmont Aviation, Inc.,* 49 F.3d 735 (D.C.Cir.1995). It is this waiver extension of the law-of-the-case doctrine that the Commonwealth would erect here against review of its DNA evidence, but the waiver rule applies only where a "ruling of law is made based on existing law and that ruling has gone unchallenged during the original appeal." *Sherley,* 889 S.W.2d at 798. *See also Crocker,* 49 F.3d at 741 n. 2 ("The waiver rule ... applies only when the trial court has expressly or impliedly ruled on a question and there has been an opportunity to challenge that ruling on a prior appeal.... If the trial court has not affirmatively ruled, the waiver doctrine would be inapplicable."). Here, the Commonwealth has failed to show that at Brown's first trial the trial court ruled upon the questions Brown now raises concerning the propriety of the Commonwealth's DNA evidence, and thus the waiver rule does not restrain our review.

**2. To The Extent That Errors May Have Occurred in the Presentation of the Commonwealth's DNA Evidence, the Errors Were Either Harmless or Were Not Preserved and Have Not Been Shown to Have Been Palpable.**

As noted above, Brown failed to preserve most of the issues implicated by his appellate challenge of the Commonwealth's DNA evidence. Thus, we review the unpreserved aspects of this challenge only for palpable error pursuant to RCr 10.26.

The Commonwealth's DNA analyst testified that using what have become standard techniques and kits for analyzing DNA samples, she analyzed samples taken from Bland and Brown, from Joseph and Jerry Kemp, from John Thompson, a friend of Brown, and from Eugene Strode, Bland's boyfriend. She then compared the profiles obtained from these known samples with the profiles she obtained from samples collected during the course of the investigation, including blood samples removed from both the knife and the tire iron, a blood sample taken from Strode's coveralls, a sample collected from Bland's fingernails, and the sample obtained from the non-bloody end of the tire iron. She testified that the blood from Strode's coveralls was Strode's and that except for the sample from the non-bloody end of the tire iron, all the samples collected from Bland and from the crime scene yielded profiles matching Bland's.

To account for these conclusions, the analyst explained that DNA—short for deoxyribonucleic acid—is a complex molecule present in all the tissues of our bodies and hence recoverable from any type of cell—skin cells, blood cells, cells present in saliva, semen, hair root cells, etc. Ninety-nine percent of the DNA molecule is identical from person to person, she testified, but there are locations along the molecule where our DNA sequences differ. The analysis she performed, a now-standard analysis used by crime labs throughout the country, isolated thirteen of those variable locations (loci) in the DNA sample, copied the isolated sequences millions of times through a process known as the polymerase chain reaction (PCR), and from the resulting magnified genetic material determined which of the possible genetic variants was present at each location or locus.[8] A profile, she testified, was the list of variants at all thirteen sites. Two DNA profiles are said to match—as Bland's profile matched the profile obtained from sev-

---

8. Although the analyst did not say so expressly, it appears that the tests she employed examined the thirteen loci which have been adopted as a national standard for use in the Combined DNA Identification System (CODIS) established by Congress in 1994.

eral crime-scene blood samples—if they are identical at all thirteen locations. The significance of a "match", the analyst testified, could be estimated from statistical data concerning the frequency with which the possible variants at each site occur within a sample population. For example, the analyst testified that the odds of choosing an unrelated person at random from the United States population with Bland's profile were on the order of 1 in 108 quadrillion, making it highly likely that the crime scene blood samples came from Bland.

As noted, the analyst also testified that the sample isolated from the non-bloody end of the tire iron was mixed, that is a sample containing DNA from more than one person. She did not explain how she reached that conclusion, nor did she explain why she concluded that the sample came from two people and not more. She did explain that in addition to the analysis of the thirteen variable locations, she also conducted a standard procedure to determine which sex chromosomes were present. That procedure yielded the presence of one y-chromosome in the mixture, and since only males have a y-chromosome she could conclude that one of the contributors to the mixture on the non-bloody end of the tire iron was male. She further testified that the successful analysis of any of the thirteen variable locations depended on a sufficiently intense indication of the variant present at that location. Analysis of a site that does not exceed a certain threshold of intensity is deemed inconclusive for that particular site, although there may be a weak indication of a particular variant.

For the mixed sample from the tire iron, six of the thirteen variable locations yielded low-intensity, inconclusive results. Seven sites, however, yielded sufficiently intense results for matching and statistical purposes. The analyst testified, although

again without explaining the reasons for her conclusions, that the results from the seven statistically relevant sites were such that neither Brown nor Bland could be excluded as a potential contributor to the mixture.[9] Nor could Brown be excluded as a potential contributor if the weak indications from the six inconclusive sites were taken into consideration. Although the analyst's testimony implicitly recognized Bland to be one of the contributors to the mixture, she did not testify expressly to that assumption, nor did she proffer any explanation about the difference between mixtures in which separate profiles can be identified and those in which separate profiles are not apparent. The analyst did testify, however, that a different statistical calculation was applied to mixtures than to single source samples, and that testimony suggests that, for statistical purposes at least, she treated the mixture as incapable of division into separate profiles. The analyst testified that on the basis of the seven sites (loci) yielding statistically meaningful results, the odds of choosing a potential contributor at random from the United States population were about 1 in 40,000. Pressed by the Commonwealth, the analyst agreed that this meant that one would expect to have to test 40,000 people to find one potential contributor. The Commonwealth then introduced, over Brown's objection, data from the 1990 United States census to the effect that the population of Adair County was some 17,000 persons, roughly half of whom were male. The intended implication, made express during the Commonwealth's closing argument, was that out of every 40,000 persons only one would be a potential contributor to the mixture, and Adair County did not have enough people to include a potential contributor other than Brown and Bland.

■ Brown contends that the analyst's testimony was essentially that the analysis

---

9. This result is referred to in DNA literature as a "non-exclusion."

of the mixture was inconclusive,[10] and he insists that inconclusive DNA analyses have no probative value. He also contends that the Commonwealth misrepresented the statistical significance of the 1 in 40,000 figure by purporting to relate it to irrelevant county census data. Although we agree that the Commonwealth's statistical arguments were flawed, for the most part, the challenge to the DNA evidence was not raised and hence not preserved at trial. It provides a ground for relief, therefore, only to the extent that it amounts to palpable error. Brown, of course, bears the burden of establishing palpable error, and as he has failed to show whether and to what extent he was prejudiced by the Commonwealth's statistical missteps, he has not met that burden. To the extent that Brown did preserve this issue by objecting to the introduction of the Adair County Census data, the error was harmless.

### a. The Commonwealth's DNA Evidence Was Sufficiently Probative to be Admissible.

 Before considering the statistics, we first reject Brown's contention that the analysis of the DNA mixture from the non-bloody end of the tire iron was so lacking in probative value as to be inadmissible. Although as noted the analyst's testimony was somewhat conclusory, the lack of detail did not render her testimony meaningless. Numerous courts have addressed the scientific reliability of PCR-based analyses of mixed DNA samples, as occurred here, and have upheld the technique as providing reliable, probative evidence concerning the composition of and potential contributors to such mixtures.[11] *See, e.g., State v. Bander,* 150 Wash.App. 690, 208 P.3d 1242 (2009); *Roberts v. United States,* 916 A.2d 922 (D.C.2007); *United States v. Trala,* 162 F.Supp.2d 336 (D.Del.2001). *Cf. Commonwealth v. Mattei,* 455 Mass. 840, 920 N.E.2d 845 (2010) (DNA evidence that defendant could not be excluded as a contributor to mixed sample was more prejudicial than probative because there was no accompanying testimony explaining the statistical relevance of the non-exclusion results.) Courts are divided on whether results, whether a "match" or a "non-exclusion," must be accompanied by

---

**10.** This is an incorrect characterization of the testimony. A DNA analysis that is "inconclusive" is generally one that provides no information whatsoever due to an insufficient sample, contamination or some other problem. *See Commonwealth v. Mathews,* 450 Mass. 858, 882 N.E.2d 833, 844–45 (2008). In this case, the analyst testified that DNA was sufficiently identifiable at seven of the thirteen loci to be replicated and tested under the PCR method. The only "inconclusiveness" was at six loci where there was not a sufficiently intense indication of the genetic variant for matching and statistical purposes.

**11.** By contrast, Brown relies on three cases which do not even purport to address the probativeness of PCR-based analyses of mixed DNA samples. *Berry v. Detroit,* 25 F.3d 1342 (6th Cir.1994) warns against "junk science" in the context of a 42 U.S.C. § 1983 case involving a retired sheriffs "expert testimony"

about law enforcement training and practices. *Roush v. Pari–Mutuel Commission of State of Wyoming,* 917 P.2d 1133 (Wyo.1996), involved the exclusion of inconclusive horse DNA results obtained at a race track after the winning horse's urine tested positive for banned drugs. *State v. Woodall,* 182 W.Va. 15, 385 S.E.2d 253, 259 (1989), did involve human DNA but it was at a time when DNA testing was in its infancy and "no state's high court [had] yet considered the use of DNA forensic tests" although the tests were accepted in the scientific community. The DNA testing was excluded in *Woodall,* not for any reason at all relevant to this case, but because the "laboratory wasn't able to isolate a DNA print from the semen [taken from the rape victim]. There being nothing to compare to the Defendant's DNA print, such evidence would not meet the general relevance test for admission of evidence." *Id.* at 260.

statistics explaining the significance of the result in the relevant population, *id.* at 851–53,[12] but mixed samples producing non-exclusion results are routinely deemed probative and admissible.

As these cases indicate, DNA analysis allows an analyst to isolate and characterize the DNA segments that vary from person to person at the thirteen polymorphic locations (loci). These genetic variants are known as alleles. At each of the thirteen locations, an individual has a pair of alleles, one inherited from each biological parent. The pair of alleles may be different or it may be the same, and it is the pattern of twenty-six alleles—two at each of the thirteen locations—that constitutes an individual's profile. Two profiles are said to "match" if all twenty-six alleles coincide. The analytic process identifies the alleles present at each locus. Since each individual has no more than two alleles at a locus, if the analysis reveals the presence at a given locus of more than two alleles, it may be concluded that the sample being analyzed includes DNA from more than one person, *i.e.,* a mixed sample. Evidently that was the case here. Because the analyst did not couch her explanation in terms of alleles, it is not possible to know precisely what she meant when she testified that the results for six of the locations were inconclusive. She may have meant that at those locations no allele was measured with sufficient intensity, or she may have meant that while some alleles appeared with sufficient intensity some did not. In neither case would the inconclusiveness at those six locations render the entire analysis inconclusive, as Brown contends.

At seven of the locations in the mixed sample from the tire iron, alleles appeared with sufficient intensity to count for statis-tical purposes. Again, because the analyst did not testify that Brown's alleles appeared at those locations, but only that those locations did not exclude Brown, one cannot tell at first glance whether it was the presence of his alleles or merely the absence of inconsistent alleles that made him a potential contributor. However, the analyst did subsequently testify that on the basis of the seven statistically significant locations, Strode, Thompson, and the Kemps could not have been contributors, and the odds of randomly choosing a potential contributor were significantly narrowed to 1 in 40,000. These facts make it clear that Brown's alleles had to appear at several, if not all, of the seven significant locations. Furthermore, the analyst testified, in effect, that at no location, even the inconclusive ones, was there the presence, or even the suggestion, of an allele inconsistent with Brown's being a contributor. The presence in the mixed sample of DNA consistent with Brown's DNA and the absence of DNA ruling him out, as the analyst testified, is clearly probative evidence linking Brown to the murder weapon. Thus, despite the six inconclusive locations, the analysis of the mixed sample yielded probative results which it was not error, much less palpable error, for the trial court to admit.

### b. The Commonwealth's Statistical Errors Do Not Entitle Brown to Relief.

 DNA analysis, of course, never "conclusively" establishes that matching profiles come from the same source. Such a match establishes only that the known source is completely consistent with the unknown sample. The significance of such a match depends on how common or rare the particular DNA profile is in some pop-

---

12. In *Sholler v. Commonwealth,* 969 S.W.2d 706 (Ky.1998), this Court held that DNA match evidence was admissible even in the absence of accompanying statistics.

ulation of interest, a fact that is estimated from data concerning how frequently the various alleles occur within the population. *State v. Bander, supra.* Analysts often convey the significance of a match or, as in

this case, of a non-exclusion from a mixture, by calculating the probability that an unrelated person chosen at random from the given population would not be excluded.[13] As noted, the analyst testified in this

---

13. "Once crime-scene and known-source DNA samples have been typed and compared and the forensic analyst has determined that the samples are sufficiently similar such that they could have originated from the same source, the analyst must then determine the statistical significance of the profiles. There are two widely recognized statistical calculations that can be performed to convey the probative value of a DNA profile typed according to the PCR–STR process.... DNA Advisory Board, [*Statistical and Population Genetics Issues Affecting the Evaluation of the Frequency of Occurrence of DNA Profiles Calculated from Pertinent Population Database(s)*, 2 FORENSIC SCI. COMM. NO., 3, ¶¶ 17–18 (2000)]. The first type of calculation estimates the probability of exclusion (PE) or probability of a random match, which expresses the probability that a random person has the same DNA profile as the evidence profile or, in other words, the probability that a random person is not excluded by the evidence. Given that the forensic analyst has concluded that a suspect or known source is a possible contributor to the unknown sample in light of the consistency between profiles, PE can be "regarded as an estimate of the answer to the question: What is the probability that a person other than the suspect, randomly selected from the population, will have this profile?" [Committee on DNA Forensic Science: An Update, National Research Council, The Evaluation of Forensic DNA Evidence] 127 [ (1996) hereinafter NCR II].

The PE calculation is based on the product rule. Using this rule, the analyst will multiply the frequencies at which particular alleles appear at specific loci by each other to determine the frequency with which the overall genotype of the tested sample could be expected to appear in the population. The factors used in PE calculations are derived from population databases that document the frequency with which particular alleles appear across a number of loci. [The Washington] Supreme Court illustrated the use of the product rule in a PE calculation:

For instance, allele A may be found in 1 of every 10 people; allele B found in 1 of 20; and allele C found in 1 of 5. Under the prod-

uct rule, if there is a match for each allele, the expert can multiply (1/10 × 1/20 × 1/5) to achieve the result that only 1 person in 1,000 will match all three sites.

.... PE is typically expressed as 1 in $X$ number of people that could have been the source of the unknown sample.

The discriminating power of a PE calculation increases according to the number of loci · at which matching alleles are reported. The greater the number of matching loci, the greater the number of frequencies that can be multiplied, resulting in a smaller overall probability. "The smaller that probability, the greater the likelihood that the two DNA samples came from the same person." NCR II at 127. Thus, a very small probability strongly suggests "that either the two samples came from the same person or a very unlikely coincidence has occurred." NCR II at 127.

The product rule can be used in a PE calculation for an ambiguous mixed-source sample, i.e., one whose contributors are not easily distinguishable as either major or minor. But doing so involves an extra step that is not included in the application of the product rule to a single-source sample or a sample where major and minor contributors can be distinguished. The National Research Council explained in 1992 that "[i]f a suspect's pattern is found within the mixed pattern, the appropriate frequency to assign such a 'match' is the sum of the frequencies of all genotypes that are contained within (i.e., that are a subject of) the mixed pattern." COMMITTEE ON DNA TECHNOLOGY IN FORENSIC SCIENCE, NATIONAL RESEARCH COUNCIL, DNA TECHNOLOGY IN FORENSIC SCIENCE 59 (1992). The addition of multiple allelic frequencies at a specific locus captures the probability that any one person could have contributed DNA to a sample with multi-allelic markers. The combination of multiple frequencies results in a frequency sum that is greater than that of the frequency for a single allelic pair. Because the resulting greater factor will be used in the ensuing multiplication, the final product will also be greater than if all of the frequencies had been individually multiplied by each other. The end result is that the probability of a random match

case that the odds of randomly choosing from the general population of the United States a potential contributor to the tire iron mixture was 1 in 40,000. She did not explain, nor was she asked, how she arrived at that figure. Assuming a United States population of about 280,000,000, she further testified that one would expect that population to contain about 7,000 potential contributors. In response to one of the prosecutor's questions, the analyst agreed that one would need to test 40,000 persons before expecting to find a potential contributor. The Commonwealth then argued, as noted above, that because the population of Adair County was only about 17,000 persons it was unlikely that the county included a contributor other than Brown. Brown maintains that the county population data was irrelevant and that the Commonwealth's argument based on that data exaggerated the significance of the DNA evidence. Although we agree with these contentions, they do not entitle Brown to relief.

■■■ As noted, DNA analysts frequently express the significance of their results by observing that there is a 1 in X chance that a non-related member of the reference population selected at random would be a potential source of the evidentiary DNA sample. Apparently, this is not the same as saying that there is a 1 in X chance that the evidentiary sample came from someone other than the defendant. It is not the same as saying that there is a 1 in X chance that the defendant is not guilty. It is not the same as saying that there is a 1 in X chance that there exists another person who matches the defendant's profile. And it is not the same as saying that X people would have to be

tested before one would expect to find another match. Jonathan J. Koehler, "Error and Exaggeration in the Presentation of DNA Evidence at Trial," 34 Jurimetries Journal 21 (Fall 1993). *See also, McDaniel v. Brown,* —— U.S. ——, 130 S.Ct. 665, —— L.Ed.2d —— (2010). Although these erroneous extrapolations from the random match statistic are not uncommon, in each instance the statistical error tends to overstate to varying degrees the strength of the DNA evidence. Koehler, *supra.* Where, as in this case, the evidentiary sample is a mixture of more than one person's DNA, the calculation of the random match statistic, or perhaps more accurately the random potential contributor statistic, is somewhat more complicated than in the case of a single source sample. Again, however, the use of the statistic in the mixed sample case has been widely upheld. *See State v. Bander, supra.* Indeed, it appears that in the case of a mixed sample, that statistic provides a conservative estimate of the probability of choosing a potential contributor at random from the reference population. *Id.* (citing *Roberts v. United States, supra*). Hence, the 1 in 40,000 statistic for the tire iron mixture versus the 1 in 208 quadrillion statistic for samples from various items at the crime scene which matched Bland's profile and the 1 in 17 trillion statistic for the sample from Strode's coveralls that matched Strode's profile.

While it appears that the Commonwealth may well have invited its DNA analyst to testify inaccurately that 40,000 persons would have to be tested before one would expect to encounter another potential contributor, Brown posed no objection to this statement at trial and does not even

---

will correspondingly be greater for a mixed-source sample than for a single-source sample. In other words, it will be more likely that a random member of the population

could have contributed his or her DNA to the unknown evidence sample." *Bander,* 208 P.3d at 1249–50 (footnote omitted).

now label it palpable error. We conclude that it is not palpable error. And while the county census data was clearly irrelevant to the statistical evidence as presented (since that evidence was based on a random selection from the general United States population and said nothing about the non-random selection of Adair County residents), it is not at all apparent to what extent, if any, Brown was prejudiced by these errors. Brown has utterly failed to demonstrate the statistical significance of the errors or to show that accurate testimony would have been meaningfully less damning than the testimony as given, particularly in light of the conservative approach the analyst apparently took. Despite the errors, moreover, the evidence indicated that Brown was far from the only possible contributor to the mixture. Significantly, through cross-examination of the analyst, Brown established that notwithstanding the Commonwealth's Adair County census data, the 1 in 40,000 statistic did not rule out the possibility of finding other potential contributors in Adair County. Under these circumstances, introduction of the census data was harmless and, otherwise, Brown has failed to meet his burden of showing that the Commonwealth's statistical evidence amounted to a palpable error. *Cf. McDaniel v. Brown, supra,* (explaining that testimony mistakenly stating the statistical significance of a DNA match did not nullify the probative value of the DNA evidence).

In summary, DNA evidence is powerful evidence and for that reason material misrepresentations of its significance are apt to be prejudicial. Here, however, where virtually no pertinent objection was raised at trial, Brown has failed to show that in and of itself the Commonwealth's possible misstatement of the statistical ramifications of the DNA evidence likely affected the verdict. Whatever weight the jury may have given this evidence is far more likely the legitimate effect of the proof that Brown's DNA was consistent with the DNA mixture obtained from the tire iron and that the odds of randomly choosing a potential contributor to the mixture were fairly narrow. Although we agree with Brown, therefore, that the Commonwealth's presentation of its DNA evidence was not flawless, he has failed to show that the flaws were prejudicial. To the limited extent that Brown preserved one claim of error by objecting to the Adair County Census data, that data, though irrelevant, was rendered harmless by the analyst's express testimony that the 1 in 40,000 statistic did not rule out the possibility of finding other potential contributors to the tire iron mixture in Adair County.

**C. The Trial Court Abused its Discretion by Permitting Cross–Examination Concerning Brown's Tattoos, But With Respect to Brown's Convictions the Error Was Harmless.**

Bland's body was discovered on January 12, 2001, and later that same day a Kentucky State Police detective opened the investigation. During the late night or early morning hours between January 13 and 14, a Columbia City police officer stopped Brown for an outstanding traffic violation, and in the course of his interview noticed that the inside of Brown's left wrist bore cuts and scratches. He passed that information on to the detective investigating Bland's murder. On January 15, the detective interviewed Brown and photographed the cut and scratches on Brown's wrist. At trial the Commonwealth moved to introduce the photograph on the ground that the scratches on Brown's wrist were consistent with the Commonwealth's theory that Brown had lifted and carried Bland's bulky, 27–inch television. The photograph also depicted a tattoo on the inside of Brown's left forearm. The tattoo shows a demonic hand

with its fingers clutching the earth and its middle finger raised in a familiar gesture of contempt. Arguing that the tattoo was unduly prejudicial, Brown objected to the photo, but the trial court overruled the objection. The Commonwealth introduced the photo without referring to the tattoo.

The tattoo again became an issue during Brown's testimony. The Commonwealth's forensic examiners had testified that none of the several hairs collected from Bland's residence matched Brown's. At the time of trial, Brown's head was shaved. To counter the impression that his shaved head might account for the absence of his hair from the crime scene, Brown's counsel during direct examination introduced a photo of Brown from near the time of the offense, when his head was not shaved, obviously to advance the defense theory that he had hair which could have been shed had he been at the crime scene. The photo had been cropped so as not to show Brown's arms, which bear several tattoos. When counsel asked Brown if the photo accurately represented his appearance in January 2001, he testified that it did but volunteered that it failed to show his tattoos.

On cross-examination, the Commonwealth asked Brown to confirm that he had tattoos, and when he did, the prosecutor asked him what the tattoos said and represented. Defense counsel's objection was overruled, on the ground that Brown's direct testimony had opened the door, and the prosecutor proceeded to elicit descriptions of several of Brown's tattoos,[14] including the demonic hand from the Commonwealth's prior exhibit. Asked what that tattoo meant, Brown replied, "F__k the world." Under further questioning, Brown described eleven more tattoos on his arms. They included his son's name, a

cross with his father's name, a dog, a six-point star, the word "untouchable", the phrase "only God knows why", his grandmother's name, a rose, the name of his neighborhood, a skull and the word "respect." During closing argument, the Commonwealth reminded the jury of three specific tattoos—the hand, "untouchable", and the phrase "only God knows why"—and suggested that the phrase referred to Bland's murder and that together the three tattoos conveyed the attitude of one capable of such an apparently senseless crime. Brown contends that all of the tattoo evidence—the Commonwealth's photograph showing the hand tattoo and all of the cross-examination concerning that and his other tattoos—was mere character evidence inadmissible under KRE 404(b) and further that the tattoo evidence was unfairly prejudicial and so much so as to be inadmissible under KRE 403. Although we disagree with Brown's contention concerning the Commonwealth's photograph, which was introduced without any mention of the tattoo and served a proper evidentiary purpose, we agree that he was improperly cross-examined. With respect to Brown's conviction, we are convinced that the error was harmless. The error was not harmless with respect to Brown's sentence, however, and would require resentencing even were resentencing not required on double jeopardy grounds.

 Contrary to Brown's assertion, the photograph of his cut and scratched wrist was relevant evidence tending to show that not long before the photo (*i.e.* right at the time of the murder) Brown had carried a heavy, bulky object such as a large television. Brown's own account that he had scratched himself moving large stereo speakers out of a friend's car gave

14. None of the tattoos were displayed to the jury by Brown showing his arms. As noted, the one tattoo was plainly visible on the photograph of Brown's wrist.

credence to this theory of relevancy. As Brown notes, under KRE 403 relevant evidence may be excluded if it is unfairly prejudicial and if the prejudicial effect substantially outweighs the evidence's probative value. *Ware v. Commonwealth*, 537 S.W.2d 174, 176 (Ky.1976) (Generally under our rules, " '[p]rejudiced' means unfairly prejudiced."). Evidence is unfairly prejudicial "if it will induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented." *United States v. Thomas*, 321 F.3d 627, 630 (7th Cir.2003) (citations and internal quotation marks omitted). When Brown objected to the photograph depicting his scratched wrist on the ground that the hand tattoo, also visible in the photo, would unfairly prejudice him, the trial court noted that tattoos are common in our current society and thus that Brown's tattoo, if introduced without comment, was not apt to have a prejudicial effect substantially in excess of the photo's probative value. We agree with the trial court, and so conclude that its admission of the wrist photo was not an abuse of discretion.

█ As Brown also notes, however, several courts have held that where tattoos are not relevant to a material issue in the case, such as the identity of the perpetrator or the defendant's membership in a conspiracy, they are inadmissible as evidence of the defendant's character or for the purpose of showing that the defendant is the sort of person apt to commit the alleged crime. *See, e.g., United States v. Newsom*, 452 F.3d 593 (6th Cir.2006); *Brooks v. State*, 903 So.2d 691 (Miss.2005); *United States v. Thomas, supra; State v. Steele*, 510 N.W.2d 661 (S.D.1994). Our rules, too, prohibit mere character or propensity evidence, KRE 404(b), and, as just discussed, evidence calculated to do nothing but rouse the jury's emotions against

the defendant. We agree with Brown that the cross-examination concerning his various tattoos and what they meant violated these rules. The tattoo evidence was not relevant to any material issue, but merely tended to suggest, in the case of the three negative tattoos singled out by the Commonwealth, that Brown was the sort of angry, disaffected person capable of murdering Sherry Bland.

█ The Commonwealth's contention that Brown opened the door to this evidence by referring to his tattoos during his direct examination is of no avail. As we recently explained in *Commonwealth v. Stone*, 291 S.W.3d 696 (Ky.2009), " 'opening the door' to otherwise inadmissible evidence is a form of waiver that happens when one party's use of inadmissible evidence justifies the opposing party's rebuttal of that evidence with equally inadmissible proof." *Stone*, at 701–02 (citing *Purcell v. Commonwealth*, 149 S.W.3d 382 (Ky.2004)). However,

> [t]he open door doctrine does not pave the way for responsive evidence just because it fits in the same general category as evidence already admitted. For example, admitting hearsay from one side does not mean the other side can offer hearsay.... The question in each case is not whether initial proof shares some common quality with proof offered in response. Rather, it is whether the latter answers the former, and whether it does so in a reasonable way without sacrifice of other important values.

*Stone* at 702 (quoting from 1 Mueller & Kirkpatrick, *Federal Evidence*, § 1:12, 75–76 (3d ed.2007)).

The Commonwealth's tattoo questioning cannot be deemed a reasonable answer to an assertion by Brown, because Brown had made no pertinent assertion. His reference to the fact that the photograph of himself did not show his tattoos asserted

nothing, and certainly nothing remotely exculpatory, about either the tattoos or his character, which might then have been subject to rebuttal by the Commonwealth. *Cf. Metcalf v. Commonwealth*, 158 S.W.3d 740, 745 (Ky.2005) ("The prosecutor may introduce evidence of the accused's bad character only to rebut evidence of the accused's good character.... And character evidence is admissible only in the form of reputation or opinion, not specific instances of conduct.") Nor did introduction of the cropped photograph open the door because, again, it did not amount to an assertion by Brown of "good" character which might have invited a response.

This case is thus distinguishable from *Urbanski v. Commonwealth*, 526 S.W.2d 7 (Ky.1975), on which the Commonwealth relies, a case pre-dating the current rules of evidence. In that case a defendant accused of drug crimes was deemed to have made a rebuttable assertion of "good" character, or at least of anti-drug character, by appearing in court well-dressed and well-groomed. By flying under such "false colors," our predecessor Court opined, the defendant invited evidence—a photograph and verbal descriptions—of his "hippy-like" appearance at other times. *Id.* at 8. Even assuming that on its narrow facts *Urbanski* remains good law, it does not aid the Commonwealth here because neither the photograph Brown introduced nor his testimony volunteering that the photo did not show his tattoos amounted to an assertion of character to which the Commonwealth could respond at all, much less with tattoo evidence violative of KRE 403 and 404(b). The trial court abused its discretion by ruling otherwise.

▮ Although the trial court should not have permitted the Commonwealth to cross-exam Brown regarding his tattoos, we agree with the Commonwealth that with respect to Brown's conviction the error was harmless. The Commonwealth used the tattoo evidence to argue that Brown regarded himself as an outsider to society and the law and that with the "only God knows why" tattoo he may have been admitting Bland's murder. On these points, however, the tattoo evidence added very little to what the jury had already learned. The jury knew, for example, that Brown was a convicted felon, that many of his friends were convicted felons and drug users, that he had not been steadily employed, and that he did not maintain his own residence but lived a semi-nomadic existence by staying for brief periods at the homes of his grandmother, his sister, and various friends. That Brown had tattoos reflective of a rebellious, even crime-tinged, life would have come as no surprise to the jury and would not have substantially swayed its guilt or innocence determination. Similarly, the jury had already heard from several of Brown's friends that he had admitted committing the crimes against Bland. The Commonwealth's unsupported speculation about the "only God knows why" tattoo added little, if anything, to that evidence. Moreover, the jury heard about Brown's numerous tattoos, several bearing family members' names, and thus to the extent those were more humanizing, the jury was not given a totally skewed impression of the messages on his body. Ultimately, the tattoo evidence, although improper, was harmless error. *See Winstead*, 283 S.W.3d at 689 (the court "can say with fair assurance that the judgment was not substantively swayed by the error").

▮ With respect to Brown's death sentence, however, we cannot with confidence say that the jury was not swayed by the improper tattoo evidence. The Commonwealth used that evidence to paint the picture of a particularly remorseless crime and that picture may well have contributed

to this second jury's conclusion that death was the appropriate sentence. Even had Brown been properly subject to the death penalty in his second trial, therefore, we would have been compelled to vacate his sentence and remand for resentencing.

### D. The Trial Court Did Not Abuse its Discretion by Admitting Autopsy and Crime Scene Photographs and a Crime Scene Video.

▮ Bland's body was discovered within two or three days of her murder. Through four witnesses, the Commonwealth introduced a number of still photographs and a video recording depicting the body and the scene of the crime. The fifteen-minute video recording was made by and introduced through the coroner, who used it to illustrate his investigation of the scene. Several still photos of the scene were introduced through two of the investigating officers. Several more photos were introduced through the medical examiner, who used them to illustrate the course and results of his autopsy examination. Several of the photos and some two minutes total of the coroner's video show the body's badly beaten and bloodied condition. Although at trial Brown objected only to the autopsy photos, he contends now that much of the crime scene depiction as well was cumulative and inflammatory and that its prejudicial effect substantially outweighed its probative value. We disagree.

▮ Although Brown correctly notes that we have disapproved of the use of photos depicting badly decomposed or mutilated bodies the condition of which no longer accurately reflects the results of the crime, *Funk v. Commonwealth*, 842 S.W.2d 476 (Ky.1992); *Clark v. Commonwealth*, 833 S.W.2d 793 (Ky.1992); *Holland v. Commonwealth*, 703 S.W.2d 876 (Ky.1985), the general rule has long been

that a photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous.... "Were the rule otherwise, the state would be precluded from proving the commission of a crime that is by nature heinous and repulsive.... Where the photographs reveal[ ] nothing more than the scene of the crime and the person[ ] of the victim[ ], they [a]re not incompetent."

*Funk,* at 479 (quoting from *Salisbury v. Commonwealth,* 417 S.W.2d 244 (Ky.1967), other citation omitted). We have applied this rule to crime scene and autopsy photos, *Epperson v. Commonwealth,* 809 S.W.2d 835 (Ky.1991); *Dant v. Commonwealth,* 258 S.W.3d 12 (Ky.2008), and to crime scene videos, *Fields v. Commonwealth,* 12 S.W.3d 275 (Ky.2000).

The general rule applies here, where there is no contention that the photo and video evidence fails to depict the results of the crime. The autopsy photos in this case were indeed numerous, but that was because Bland's injuries were numerous, not because the evidence was cumulative. The extent and nature of Bland's injuries was relevant, as the Commonwealth points out, not only to show the cause of Bland's death, but also as tending to show the murderous intent of her attacker, the likely sort of murder weapons, and even, because of the extreme brutality of the assault, the likelihood that persons with knowledge of the crime would be afraid to come forward. The trial court did not abuse its discretion under KRE 403 by admitting the autopsy photos. The unobjected-to crime scene depictions were relevant for the same purposes, and their admission likewise was not erroneous, much less palpably so. Brown is not entitled to relief on this ground.

### E. The Trial Court Properly Admitted Stephanie McClain's Hearsay Testimony.

■ At trial, the Commonwealth called Adam Dudley, one of Brown's friends, and asked him if, in one of their conversations, Brown had not admitted that he murdered Bland. Dudley denied that Brown had made such an admission to him or that he had repeated the admission to his girlfriend. Thereupon, the Commonwealth called the girlfriend, Stephanie McClain, who testified that Dudley had told her that in a phone conversation with Brown, Brown had confessed to Bland's murder. Brown contends that the trial court erred by admitting McClain's testimony, which, by repeating out-of-court statements by both Brown and Dudley, amounted to double hearsay.

■ The same issue arose at Brown's first trial when another of Brown's friends, Shane Hughes, similarly denied conversing with Brown about the murder or repeating Brown's remarks to Archie Lane. Lane then testified that Hughes had repeated Brown's confession to him, and in Brown's first appeal we rejected his hearsay objection. We explained that

> [a]lthough the testimony of Lane as to what Hughes said Brown told him was double hearsay, it was admissible because each part of the combined statements conforms with an exception to the hearsay rule. KRE 805. *See also, Thurman v. Commonwealth,* 975 S.W.2d 888, 893 (Ky.1998). Brown's statements were admissible as admissions of a party. KRE 801A(b)(1); *Thurman, supra.* Hughes could have testified to those statements because he was the person to whom the admissions were made. His

statements to Lane were then admissible as prior inconsistent statements of a witness. KRE 801A(a)(1); *Thurman; Jett v. Commonwealth,* 436 S.W.2d 788 (Ky.1969). The proper foundation was laid for the admission of Lane's testimony by asking Hughes if he had made any statements to Lane. KRE 613(a); *Thurman.* The fact that Hughes was never asked if he had made the particular statements to Lane is of no consequence. Hughes denied making any statements to Lane about what Brown had said to him.

*Brown v. Commonwealth,* 2003–SC–1023–MR, 2005 WL 2044538 (Aug. 25, 2005).[15] Clearly McClain's testimony was admissible pursuant to the same rules and reasoning, but Brown contends that, while his statement to Dudley (and by implication to Hughes) would be admissible as the admission of a party, Dudley's (and Hughes's) repetition of that statement, although admissible under our evidentiary rules, was inadmissible under the Sixth Amendment's Confrontation Clause as interpreted by the United States Supreme Court in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). We disagree.

In *Crawford,* the Supreme Court held that if the declarant does not testify at trial, his "testimonial" hearsay statements are not admissible, regardless of the hearsay rules, unless he is unavailable to testify and his hearsay statements were previously subject to cross-examination. *Id.* at 54, 124 S.Ct. 1354. The Supreme Court has yet to provide a definition of "testimonial," but in *Crawford* it distinguished testimonial statements from casual remarks to friends. It is highly unlikely, therefore, that Dudley's remarks to his girlfriend, McClain, are to be deemed "testimonial"

---

**15.** Lane testified to the same effect at Brown's second trial, and Eddie Ingram also testified that Hughes repeated Brown's confession to him. Brown does not challenge Lane's and Ingram's double hearsay, apparently conceding that it is governed by the law of the case.

for *Crawford's* purposes. *See Hartsfield v. Commonwealth*, 277 S.W.3d 239 (Ky.2009) (spontaneous, informal statements unsolicited by law enforcement or its surrogate not testimonial under *Crawford*.). As the *Crawford* Court explained, moreover, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.... The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *Id.* at 59, 124 S.Ct. 1354 (citation omitted). Dudley, of course, (and Hughes) did appear for cross-examination at Brown's second trial, and thus, even if his statements to McClain were to be deemed testimonial, *Crawford* would not bar their admission under our rules.

Brown also invites us to jettison KRE 801A(a)(1), the rule permitting the introduction of a witness's prior inconsistent statement as substantive evidence as well as for impeachment, and urges us to adopt a rule whereby such prior inconsistent statements would not be admissible unless made under oath. Brown has offered no reason, much less a compelling one, to depart from a rule that has served us well for forty years, *Jett, supra,* and we thus decline his invitation.

**F. Jerry Kemp's Repetition of His Mother's Remarks Was Properly Admitted for a Non–Hearsay Purpose.**

■ Jerry Kemp testified that in the wee hours one morning at about the time of the murder, Brown arrived at his, Kemp's, apartment with a television set he claimed to have acquired from someone on "the Pike." A couple of weeks later, Kemp testified, his mother called him and told him of news reports to the effect that a television had been stolen from Bland's residence. She also told him that the set described in the reports was similar to the one Brown had given him. Kemp decided that having the television set in his apartment "was not too smart," and so insisted that Brown help him get rid of it. According to Kemp, the two then hauled the set outside of town and dumped it alongside the road.

Brown contends that Kemp's repetition of his mother's statements concerning the news reports violated the rule against hearsay, the rule that generally precludes out-of-court statements offered into evidence to prove the truth of the matter asserted in the statement. KRE 801; KRE 802. The mother's statements were not hearsay, however, because they were not introduced to prove the truth of the matter asserted. *Ragland v. Commonwealth*, 191 S.W.3d 569 (Ky.2006); *Slaven v. Commonwealth*, 962 S.W.2d 845 (Ky. 1997). They were not introduced to prove that Bland's television had been stolen, for the mother was not purporting to have independent knowledge of that fact. Nor were they introduced to prove that Bland's television was like the one in Kemp's apartment, for again, the mother was not purporting to have independent knowledge of what Bland's set looked like. The statements were introduced, rather, merely to explain why Kemp insisted that Brown help him get rid of the television set Brown had left with him. *See* Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.05(3) ("The mere making of a statement may be relevant to prove the state of mind of a person in whose presence the statement was made" and, its use in such circumstances is non-hearsay.) The trial court did not abuse its discretion by admitting for that purpose Kemp's repetition of his mother's statements.

**G. The Trial Court Did Not Infringe Upon Brown's Right to Present a Defense When it Excluded Evidence of**

**Bland's Drug Use, the Relevance of Which Was Not Established.**

Brown next contends that the trial court improperly excluded evidence vital to his defense, evidence, he maintains, suggesting that someone else may have committed the crimes against Bland. Because the evidence Brown sought to introduce was marginally relevant at best, however, the trial court did not abuse its discretion by excluding it.

Bland's body was discovered by Mary Fortner who was the mother of Bland's boyfriend, Eugene Strode. In January 2001, Strode was incarcerated at the Adair County Jail, but through a work release program he worked during the day at the Columbia Housing Authority. Apparently Strode and Bland contrived to see each other at the Housing Authority during his hours of release. When Bland, who did not have a phone, did not come to the Housing Authority on Wednesday, January 10, 2001, Strode asked his mother and another friend, Shannon Wheeler, to visit Bland and ask her to call him. Strode testified that in response to a note his mother left for her, Bland called him at about ten-till-four that afternoon. Wheeler testified that she stopped briefly at Bland's residence at about ten-after-six that same day and that Bland, who was watching television, seemed fine. On Friday, January 12, Bland again missed a luncheon engagement with Strode at the Housing Authority, and again he asked his mother to check on her. Fortner and a friend went to Bland's residence that afternoon. Fortner died prior to Brown's first trial, but the friend testified that Fortner had hardly entered Bland's residence before she returned, screaming that Bland was dead.

At trial, Brown sought to introduce the note Fortner apparently delivered to Bland on Wednesday afternoon, and he sought to cross-examine Strode concerning his and Bland's use of illegal drugs. The note included the following passage: "he [Strode] said he has to talk to you it is very important he said, so be sure to call him, if not today call tomorrow. Love mom. The number is . . . . He don't go in till 15, till 4. Something is going on I don't know what." The trial court excluded the note on hearsay grounds. Strode testified on avowal that the note was in his mother's handwriting, but that he was not aware of anything "going on."

Brown also sought to cross-examine Strode concerning his and Bland's use of crack cocaine. Apparently the police had initially questioned Strode about cocaine and he had admitted that he and Bland had used cocaine in the past, but denied that they had done so for some time prior to Bland's murder. The Commonwealth presented no drug-related evidence. The trial court disallowed the cross-examination concerning cocaine as irrelevant.

Brown contends that both Fortner's note and Strode's and Bland's history of drug use were relevant as somehow suggesting that there might have been drug debts or perhaps some other drug-related motive for Bland's murder, and that such a motive might have been the something "going on" referred to in the note. Strode's drug use was relevant, furthermore, according to Brown, as somehow giving Strode a motive to testify against Brown. These vague, speculative suggestions, however, are not enough to make this evidence relevant.

Brown is correct, of course, that under both the Kentucky and the United States Constitutions, he has the right to present a complete and meaningful defense. *Beaty v. Commonwealth*, 125 S.W.3d 196 (Ky.2003); *Holmes v. South Carolina*, 547 U.S. 319, 126 S.Ct. 1727, 164

L.Ed.2d 503 (2006). This right includes both the right to confront the witnesses against him with evidence reasonably suggestive of bias, *Beaty, supra; Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), as well as the right to present evidence reasonably suggestive that someone else committed the charged crimes. *Beaty; Holmes, supra.* A defendant is not at liberty, however, "to present unsupported theories in the guise of cross-examination and invite the jury to speculate as to some cause other than one supported by the evidence." *Davenport v. Commonwealth,* 177 S.W.3d 763, 772 (Ky. 2005) (citing *Commonwealth v. Maddox,* 955 S.W.2d 718 (Ky.1997), internal quotation marks omitted). *See also Holmes,* 547 U.S. at 326, 126 S.Ct. 1727 ("Constitution permits judges to exclude evidence that is ... only marginally relevant.") (citation and internal quotation marks omitted).

The mere fact that a murder victim may have used drugs, does not, without more, permit a reasonable inference that her murder was drug-related. Here, aside from Strode's brief testimony at trial that Bland was on prescription medications and had at some point in the past tried cocaine, there was no evidence of a drug supplier, of drug debts, or of any other drug connection. Absent evidence reasonably suggesting Strode's or some other third party's involvement in Bland's murder, Brown's drug theory was nothing more than an invitation to the jury to speculate, and the trial court did not abuse its discretion by disallowing such speculation based on either Fortner's note to Bland or Bland's history of drug use.

For the same reason, the trial court did not abuse its discretion by limiting cross-examination concerning Strode's own drug use. There was no evidence, such as pending criminal charges, say, to suggest that Strode's drug use gave him a reason to favor the Commonwealth, and no evidence remotely suggesting that Strode had any reason, drug-related or otherwise, to be biased against Brown. The trial court did not abuse its discretion by foreclosing speculation on those points.

**H. Brown's Right to Present a Defense Was Not Infringed by the Exclusion of Evidence That the Kemps Were Subsequently Involved in the Theft of a Television.**

■ Brown further contends that his right to present a defense was infringed when the trial court excluded evidence that, about a year after Bland's murder, Jerry and Joseph Kemp were involved in the theft of a television from a woman's apartment. This evidence, according to Brown, permits a reasonable inference that the Kemps and not he committed the crimes against Bland. This same contention was raised and rejected in Brown's first appeal. In our previous opinion, we discussed the issue as follows:

During Brown's case-in-chief, he presented a witness who indicated that she had a television stolen from her home and that the Kemp brothers were involved. This occurred almost a year after the crime in this case. The trial judge prohibited the testimony and admonished the jury to disregard the portion of it they heard. The witness later testified by avowal that her television was stolen from her home and that several individuals, one of whom was Joseph Kemp, had participated in the theft. She later heard that Jerry Kemp was in possession of the television and she attempted to retrieve it from him. Unable to do so, she had all the participants arrested. Jerry Kemp later returned the television and the charges were dropped. A defendant does have a right to introduce evidence that another

person committed the offense with which he is charged.... That right, however, is not unlimited. Evidence is not automatically admissible simply because it tends to show that someone else committed the offense.... For instance, motive evidence alone is insufficient to guarantee admissibility.... The same can be said for evidence of opportunity.... Evidence that Jerry and Joseph Kemp were involved with or were in possession of a second stolen television nearly a year after the present crime was committed demonstrated neither motive nor opportunity in this case. Moreover, although Brown had indicated earlier in a statement to the police that the Kemps where involved in the present crime, he recanted that story entirely at trial. He still claimed that he did not commit the present offenses, but when he testified, he was no longer casting any blame on the Kemps. Brown was not denied his right to present a defense by the exclusion of the "reverse 404(b)" evidence.

*Brown v. Commonwealth,* 2003–SC–1023–MR, 2005 WL 2044538 (Aug. 25, 2005) (citations omitted). Brown concedes that the exclusion of this evidence is thus the law of the case, but urges us nevertheless to reconsider our prior ruling. As explained above, however, we will deviate from the law of the case only where our previous decision was clearly erroneous and works a manifest injustice. Those concerns are not present here. Brown's assertions to the contrary notwithstanding, the Kemps' involvement with others in the theft of a television from an apartment from which the occupant was absent in no way serves to establish either a motive or the opportunity for their perpetration a year earlier of the brutal crimes against Bland. Exclusion of that purely speculative evidence did not infringe upon Brown's right to present a defense.

## V. The Trial Court Did Not Err in Denying a Jury Instruction on Receiving Stolen Property.

■ Brown next contends that the trial court erred when it refused to instruct the jury on what Brown characterizes as the lesser-included offense of receiving stolen property. He maintains that he was entitled to such an instruction based on the testimony by Jerry Kemp and Charlene Farmer to the effect that when Brown brought them the television set in January 2001 he said that he had obtained it "from a crack head down at the Pike." The trial court disallowed the tendered instruction because in its view that slender reed of evidence was not enough to permit a rational juror to conclude that Brown—notwithstanding his defense of total denial of having anything whatsoever to do with Bland or her television set—was not guilty of stealing Bland's television but was somehow guilty of receiving it from someone else. Brown contends that the trial court erred by refusing to give the jury that option. We disagree.

■ Brown correctly notes that "it is the duty of the trial court in a criminal case to instruct the jury on the whole law of the case, RCr 9.54(1), and this rule requires instructions applicable to every state of the case deducible from or supported to any extent by the testimony." *Thomas v. Commonwealth,* 170 S.W.3d 343, 348–49 (Ky.2005) (citing *Webb v. Commonwealth,* 904 S.W.2d 226 (Ky.1995)). This does not mean, however, that speculative theories are to be put before the jury in the instructions merely because the testimony includes some basis for the speculation. Rather, "an instruction on a lesser included offense is required if the evidence would permit the jury to *rationally* find the defendant not guilty of the primary offense, but guilty of the lesser offense."

*Fields v. Commonwealth,* 219 S.W.3d at 749 (*quoting Thomas,* 170 S.W.3d at 349). The trial court did not abuse its discretion here by ruling that Brown's statement to Kemp and Farmer about acquiring the television "at the Pike" provided no more than speculative proof of a theory of the case that was not suggested by any other evidence and that neither party gave even passing notice. No rational juror could have concluded from the totality of the evidence presented that Brown just happened to acquire a television matching Bland's stolen from her by someone else who happened to sell or give it to Brown.

■ An additional reason for upholding the trial court's decision, although a reason not relied on by the trial court itself, is that, as the Commonwealth points out, while lesser included offenses must be included in the instructions if adequately supported by the evidence, "the fact that the evidence would support a guilty verdict on a lesser uncharged offense does not entitle a defendant to an instruction on that offense." *Hudson v. Commonwealth,* 202 S.W.3d 17, 21 (Ky.2006). Here, receiving stolen property is not a lesser-included offense of robbery, *Roark v. Commonwealth,* 90 S.W.3d 24 (Ky.2002), it is a lesser-uncharged offense, and thus even had the evidence supported a guilty verdict on that offense, Brown was not entitled to a receiving-stolen-property instruction.

## VI. Brown's Trial Was Not Rendered Unfair by Prosecutorial Misconduct.

■ Brown next complains of several instances of what he characterizes as prosecutorial misconduct. Some of this misconduct took the form of allegedly improper questions, generally questions asked upon redirect of prosecution witnesses, and some allegedly occurred during the prosecutor's closing arguments. Brown objected only twice to the allegedly improper questions and not at all during the prosecutor's closings. We will reverse for prosecutorial misconduct where it was objected to if proof of the defendant's guilt was not such as to render the misconduct harmless, and if the trial court failed to cure the error with a sufficient admonishment to the jury. Where there was no objection, we will reverse only where the misconduct was flagrant and was such as to render the trial fundamentally unfair. *Barnes v. Commonwealth,* 91 S.W.3d 564 (Ky.2002); *Partin v. Commonwealth,* 918 S.W.2d 219 (Ky.1996).

### A. It Was Not Improper for the Prosecutor to Ask a Witness Whose Veracity Had Been Impeached Whether He Had Testified Truthfully.

■ One of the questions to which Brown objected was asked during the redirect examination of Eddie Ingram. Ingram, it will be recalled, testified that Brown confessed these crimes to Ingram himself and to a mutual friend, Shane Hughes. During cross-examination, counsel for Brown sought to impeach Ingram's veracity by suggesting that Ingram was testifying favorably to the Commonwealth in exchange for leniency with respect to criminal charges of his own. On redirect, the Commonwealth asked whether Ingram had in fact received any benefit in exchange for his testimony and whether "what you told the jury about what the defendant told you has been the truth." Brown objected to this latter question, the trial court overruled the objection, and Ingram affirmed that his testimony had been truthful.

■ Brown observes that the credibility of a witness is generally a matter for the jury to determine, and insists that the prosecutor's invasion of that province de-

nied Brown a fair trial. Brown is correct, of course, that one witness is not permitted, and should not be asked, to comment upon the truthfulness of another witness's testimony. *Moss v. Commonwealth,* 949 S.W.2d 579 (Ky.1997). Nor is a witness allowed to bolster his or her own testimony unless and until it has been attacked in some way. *See, e.g.,* KRE 801A(a)(2) (limiting the use of a witness's prior consistent statements); *State v. Skipper,* 337 N.C. 1, 446 S.E.2d 252 (1994) (improper during direct examination to ask if witness is being truthful). Once a witness has been impeached, however, "the party introducing him may introduce evidence to corroborate his testimony or support his credibility." *Samples v. Commonwealth,* 983 S.W.2d 151, 154 (Ky.1998) (citations and internal quotation marks omitted).

▇ Whether under this general rule merely asking the witness if he or she has been truthful is a proper method of rehabilitation is a question that appears not to have been widely addressed. A few courts have expressed disapproval of such questions, *e.g., City of Highland Park v. Block,* 48 Ill.App.3d 241, 6 Ill.Dec. 285, 362 N.E.2d 1107 (1977) (in light of witness's oath, the question is not meaningfully rehabilitative), others have approved them, *Grayson v. United States,* 107 F.2d 367 (8th Cir.1939), or found them not to have amounted to plain error. *State v. Chapman,* 359 N.C. 328, 611 S.E.2d 794 (2005). We are inclined to agree with the Court in *People v. Tingle,* 279 Ill.App.3d 706, 216 Ill.Dec. 323, 665 N.E.2d 383 (1996), that where the impeachment has attacked not the witness's perception or memory but has focused intently on the witness's veracity, it is within the trial court's discretion to permit the witness on redirect to deny the imputation of dishonesty. It may be that such testimony adds little to the witness's oath, but for that very reason it

poses little risk of short-circuiting the jury's credibility determination, the risk that is posed when one witness vouches for another.

Here, Brown's cross-examination of Ingram dealt at length with Ingram's criminal past and the possibility that he had something to gain from the Commonwealth by testifying against Brown. The implication, italicized and underscored, was that Ingram was lying so as to benefit himself. In these circumstances, the trial court did not abuse its discretion by permitting the Commonwealth to ask Ingram on redirect whether his testimony regarding Brown's confessions was the truth.

Brown did not object to similar questions posed on redirect to Archie Lane and to Stephanie McClain, who likewise testified that they had learned of Brown's confession and were attacked on cross-examination as having reasons for currying favor with the Commonwealth. In light of our discussion with respect to the Commonwealth's efforts to rehabilitate Ingram, we are convinced that the similar and unobjected-to rehabilitation of Lane and McClain did not render Brown's trial fundamentally unfair.

**B. A Witness's Reference to the Fact That Brown Had Not Consented to a Search Was Cured by Sufficient Admonition.**

▇ During the Commonwealth's direct examination of the lead detective on the case, the prosecutor asked whether during June of 2002 he had obtained DNA samples from Strode and Brown. The detective answered that he had, and added, although he was not asked, that Brown's sample was collected pursuant to a search warrant. Several questions later, when asked how he had collected the DNA samples, the detective gave a response that went beyond the question by noting that Strode volunteered his sample while

Brown's involved a search warrant. At this second mention of a search warrant, counsel objected on the ground that Brown's exercise of his Fourth Amendment rights was not relevant. The trial court sustained the objection and at Brown's request admonished the jury to disregard the search warrant reference. Notwithstanding the relief he obtained from the trial court, Brown now contends, apparently, that the reference to the search warrant rendered his trial fundamentally unfair. We disagree.

■■■ As we recently reiterated in *Benjamin v. Commonwealth*, 266 S.W.3d 775 (Ky.2008),

> [i]t is well-settled law within the Commonwealth that a "jury is presumed to follow an admonition to disregard evidence; thus, the admonition cures any error".... Moreover, "[t]here are only two circumstances in which the presumptive efficacy of an admonition falters: (1) when there is an overwhelming probability that the jury will be unable to follow the court's admonition *and* there is a strong likelihood that the effect of the inadmissible evidence would be devastating to the defendant; or (2) when the question was asked without a factual basis *and* was inflammatory or highly prejudicial."

*Id.* at 788 (quoting *Combs v. Commonwealth*, 198 S.W.3d 574 (Ky.2006), other citations and internal quotation marks omitted). Neither exception applies here. It is well-known that search warrants are common in criminal cases. The passing reference to a warrant here is not at all likely to have affected Brown's case, much less to have devastated it. There was, moreover, a factual basis for the detective's non-responsive search-warrant reference, which, although improper, was neither inflammatory nor highly prejudicial. The trial court's admonition was sufficient,

and Brown, accordingly, is not entitled to relief on this ground.

**C. None of the Prosecutor's Unobjected–To Questions or Remarks Rendered Brown's Trial Unfair.**

■■■ Nor is Brown entitled to relief for any of the unpreserved instances of alleged prosecutorial misconduct. First, the Commonwealth's rehabilitation of Barbara Slater, the Kemps' mother, who was asked on redirect whether she regretted not having come forward sooner with her suspicions about the television set Brown gave to her son, was a fair response to Brown's cross-examination of Slater. Specifically, Brown's questions suggested that Slater had not come forward because she feared her sons were involved with Bland's murder.

■■■ On redirect, the Commonwealth asked two of its forensic witnesses whether they and their labs ever performed analyses for defendants and whether Brown had asked for any additional analyses here. Again, the questions were in response to cross-examination. Brown had posed questions suggesting that the labs were biased in favor of the prosecution and that they neglected tests potentially damaging to the prosecution's case. It was certainly within the scope of redirect to ask about the labs' and the technicians' neutrality.

■■■ With respect to the question about Brown's request for testing, Brown is correct, of course, that the Commonwealth bears the burden of proving all the elements of the crime and that it is improper to shift that burden to the defendant. *Commonwealth v. Collins*, 821 S.W.2d 488 (Ky.1991). In *Shabazz v. Commonwealth*, 153 S.W.3d 806 (Ky.2005), however, a case, like this one, in which the defendant asserted an inadequate-investigation defense, the prosecutor responded aggressively that had the defendant want-

ed further investigation he was free to request it or to provide it himself. The defendant objected to that response, but his objection was overruled. On appeal, this Court acknowledged that to the extent the prosecutor's response tended to suggest that the defendant bore the burden of proving himself innocent it was improper, but held that relief was not appropriate because, notwithstanding the prosecutor's impropriety, it was clear that the defendant had received a fair trial at which the jury had been instructed and understood that the Commonwealth bore the burden of proving each element of every charge. The same can be said here. In fact, given that the prosecutor's questions—which amounted only to momentary asides in a trial that lasted for several days—were much less troublesome than the prosecutor's remarks in *Shabazz*, there was no contemporaneous objection, the evidence against Brown was substantial, and the jury was correctly instructed as to the Commonwealth's burden of proof, we are convinced that the prosecutor's impropriety, if any, did not constitute a manifest injustice or render Brown's trial fundamentally unfair.

Brown also failed to object to what he now claims were a couple of improper guilt phase closing arguments. He complains that the prosecutor improperly vouched for his witnesses by asserting that they "came up here and told the truth." This remark can be fairly construed, however, not as a statement of the prosecutor's personal belief but as a comment on the veracity debate discussed above. It most assuredly did not render Brown's trial manifestly unjust.

▬ Nor was Brown's trial rendered unfair by the prosecutor's comment during closing that Brown had not called John Thompson as a witness. Thompson was a friend or acquaintance of Brown, and at one point in Brown's testimony he claimed that in November 2001 he learned from Thompson that Jerry and Joseph Kemp had made accusations that he, Brown, was involved in Bland's murder. Brown testified that information prompted him to concoct false accusations against the Kemps. At another point in his testimony, Brown claimed to have learned of certain of the allegations against him not from Thompson but from his discovery papers. During his closing argument, the prosecutor argued that Brown's testimony tending to claim that Thompson gave him his knowledge of the crime (as opposed to having gained it first hand) was belied by the fact that the defense had not called Thompson to testify.

▬ Brown contends that the prosecutor's comment was improper, but he has failed to explain why. He refers us to *Sexton v. Commonwealth*, 304 Ky. 172, 200 S.W.2d 290 (1947), a case largely superseded by *Bixler v. Commonwealth*, 204 S.W.3d 616 (Ky.2006). *Sexton*, according to Brown, makes it improper during closing argument to comment unfavorably on the opposing side's failure to call a witness who would have been incompetent to testify or who would have testified only to immaterial or irrelevant matters. He fails to explain how this rule applies to Thompson. Although Brown's testimony regarding Thompson was ambiguous, that ambiguity hardly establishes that Thompson's testimony would necessarily have been immaterial, and Brown points to nothing to suggest that Thompson would have been incompetent to testify. When the defendant testifies, the prosecutor is allowed to comment on the defendant's credibility. *Tamme v. Commonwealth*, 973 S.W.2d 13 (Ky.1998). Such comment may include noting the absence of obvious witnesses where the absence tends to belie the defendant's claims. *Maxie v. Common-*

*wealth,* 82 S.W.3d 860 (Ky.2002). Brown's testimony had some tendency, however confused or attenuated, to suggest that his conversation with Thompson accounted for some aspects at least of his knowledge of the crime. He has not demonstrated that the prosecutor's comments combating that suggestion were improper, much less that they rendered his trial fundamentally unfair.

Brown also complains that the prosecutor made improper arguments during his penalty phase closing, but as the alleged misconduct is not apt to recur on remand our vacation of Brown's sentence renders those complaints moot.

## VII. Reversal is Not Required Because of Cumulative Error.

■ Finally, Brown contends that his conviction should be reversed on the basis of cumulative error, the doctrine under which multiple errors, although harmless individually, may be deemed reversible if their cumulative effect is to render the trial fundamentally unfair. We have found cumulative error only where the individual errors were themselves substantial, bordering, at least, on the prejudicial. *Funk v. Commonwealth, supra.* Where, as in this case, however, none of the errors individually raised any real question of prejudice, we have declined to hold that the absence of prejudice plus the absence of prejudice somehow adds up to prejudice. *Furnish v. Commonwealth,* 95 S.W.3d 34 (Ky.2002). Although errors crept into this trial, as they inevitably do in a trial as complex and long as this one, they did not, either individually or cumulatively, render the trial unfair.

## VIII. Brown's Other Claims of Sentencing Error Have All Been Rendered Moot.

Brown raises several additional arguments challenging the capital sentencing procedures in this case, the trial court's consideration of victim impact statements, and the constitutionality of capital punishment in general. Our reversal of Brown's death sentence renders these issues moot.

## CONCLUSION

In sum, because the jury who first heard Brown's case found that the death penalty was not appropriate, Brown should not have been subjected to the death penalty at his retrial. We vacate, accordingly, Brown's death sentence and remand in order that Brown may be resentenced for murder. Otherwise, however, Brown's trial, though flawed in minor ways, was fundamentally fair. Jury selection, the admission and exclusion of evidence, the jury instructions, and the prosecutor's conduct during both the examination of witnesses and closing argument, all adequately comported with Brown's right to a fair trial. In all respects aside from Brown's death penalty, therefore, we hereby affirm the August 21, 2006 Judgment of the Warren Circuit Court.

NOBLE, J., concurs.

CUNNINGHAM, J., concurs in result only by separate opinion in which MINTON, C.J., joins.

ABRAMSON, J., concurring in part and dissenting in part by separate opinion in which VENTERS, J., joins.

SCOTT, J., concurring in part and dissenting in part by separate opinion in which SCHRODER, J., joins.

CUNNINGHAM, J., concurring in result only:

I write to emphasize that Kentucky law does not require the jury to find as a fact, beyond a reasonable doubt, that the death penalty is the appropriate penalty. How-

ever, in this particular case, such an instruction was given. For that reason, I am constrained to concur in result only.

When a jury recommends the death penalty, KRS 532.025(3) requires only that the jury "designate in writing ... the aggravating circumstance or circumstances which it found beyond a reasonable doubt." This Court has previously stated that "[t]here is no requirement that the jury be instructed to find that death is the appropriate punishment beyond reasonable doubt." *Skaggs v. Commonwealth,* 694 S.W.2d 672, 680 (Ky.1985) (vacated in part by *Skaggs v. Parker,* 235 F.3d 261 (6th Cir.2000)). Because Kentucky's death penalty statute suitably narrows the class of defendants who are eligible for the death penalty, then guides and directs the jury's sentencing discretion with clear and objective standards, it has repeatedly been held constitutional absent such a requirement. *See Kordenbrock v. Scroggy,* 680 F.Supp. 867, 898 (E.D.Ky.1988) ("[T]he Kentucky statute is not in violation of the Eighth and Fourteenth Amendments."). *See also McQueen v. Scroggy,* 99 F.3d 1302, 1333 (6th Cir.1996); *Thompson v. Commonwealth,* 147 S.W.3d 22, 55 (Ky.2004); *Ice v. Commonwealth,* 667 S.W.2d 671, 679 (Ky. 1984); *Gall v. Commonwealth,* 607 S.W.2d 97, 113 (Ky.1980).

The U.S. Supreme Court has not specifically addressed what standard of persuasion is required by the Eighth Amendment in death penalty proceedings. Rather, its focus has remained on the overall statutory scheme and its ability to reduce capricious or arbitrary imposition of the death penalty. *See Gregg v. Georgia,* 428 U.S. 153, 188–95, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). As such, some states employ the reasonable doubt standard in determining the appropriateness of the death penalty. *See, e.g., State v. Wood,* 648 P.2d 71, 83 (Utah 1982). Others, however, have re-

jected the argument that the failure to require the jury to find that death is appropriate beyond a reasonable doubt renders a death penalty statute unconstitutional. *See, e.g., People v. Benson,* 52 Cal.3d 754, 276 Cal.Rptr. 827, 802 P.2d 330, 362 (1990) (again rejecting claim that U.S. Constitution requires instruction that jury must find death is appropriate beyond a reasonable doubt). *See also State v. Jenkins,* 15 Ohio St.3d 164, 473 N.E.2d 264, 280 (1984) (jury need not be statutorily required to determine death penalty is appropriate where procedural safeguards ensure appropriateness).

I am persuaded that the use of the reasonable doubt standard in the penalty arena would serve little purpose. When the jury is directed to consider the aggravating and mitigating circumstances, and then to fix punishment, the jury is essentially determining what it believes to be the appropriate penalty. I reject the contention that a reasonable doubt instruction underscores, for the jury, the level of expected certainty in its decision. I trust a capital sentencing jury has little doubt as to the profound nature of its task. Rather, I agree with the California Supreme Court that the reasonable doubt standard is a "term[ ] associated with traditional fact-finding" and not suited to the "inherently moral and normative" sentencing function. *People v. Rodriguez,* 42 Cal.3d 730, 779, 230 Cal.Rptr. 667, 726 P.2d 113 (Cal.1986).

It is unknown to the writer how many people on death row today were sentenced without instructions requiring the jury to find death beyond a reasonable doubt. It is unknown how many pled guilty and were sentenced to death without the court finding that death was appropriate beyond a reasonable doubt. For that reason, I write to emphasize that no such instruction is either required or appropriate.

Lastly, and on another issue, I agree that the introduction of the tattoo evidence in the guilt stage was error, although harmless. However, I believe that it is admissible for sentencing purposes. Tattoos, like bumper stickers, are manifestations of a person's attitude toward the world around them. It is both relevant and probative as to sentencing.

MINTON, C.J., joins.

ABRAMSON, J., concurring in part and dissenting in part:

I respectfully dissent from the majority's view, expressed in footnotes 2 and 3, that the reasonable doubt instruction set forth at § 12.08 of *Kentucky Instructions to Juries, Criminal* should no longer be given. Although KRS 532.025 does not require that the propriety of death be found beyond a reasonable doubt, I believe that an instruction to that effect is consistent with the Kentucky capital sentencing scheme. KRS 532.025(2) requires that the fact finder "shall consider . . . any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating or mitigating circumstances which may be supported by the evidence. . . ." This direction of the jury's deliberations in a capital sentencing phase as to the finding and weighing of aggravating and mitigating circumstances and the indisputable proposition that "death is different," in my opinion, render it appropriate to direct the jury to find the propriety of death beyond a reasonable doubt before that sentence may be imposed. Even if that particular instruction is omitted, however, I believe that the death penalty "acquittal" concept enunciated by Justice O'Connor in both *Rumsey*, 467 U.S. at 211, 104 S.Ct. 2305 and in *Sattazahn*, 537 U.S. at 117, 123 S.Ct. 732, would still apply to bar the prosecutor's second attempt at securing the death penalty where the first jury chooses something less than death as the appropriate sentence.

VENTERS, J., joins.

SCOTT, J., concurring in part and dissenting in part:

Although I concur with the majority on the other issues, I must dissent as to the majority's finding of an "implied acquittal" in Section I. of the majority opinion (including their reversal of *Commonwealth v. Eldred*, 973 S.W.2d 43 (Ky.1998) and *Salinas v. Payne*, 169 S.W.3d 536 (Ky.2005)), as well as their comment in Section IV. C. that, although they found the error regarding the tattoo testimony to be harmless, it may *not* have been harmless as to Appellant's death sentence.

As to the error regarding the introduction of the tattoo evidence, I fail to see—given the voluminous evidence—how it could be found harmless in one instance, yet be doubtful in another. Clearly, this error was harmless in all contexts. As to the majority's "implied acquittal" of the death penalty, this Court noted in *Salinas* that:

> We are of the opinion that the succession of United States Supreme Court cases since our decision in *Eldred* does not change the effect of its holding. An "implied acquittal" of the death penalty occurs only where the jury or reviewing court affirmatively finds that the Commonwealth has failed to prove the existence of an aggravating circumstance. If the jury has found that evidence of an aggravating circumstance was proven beyond a reasonable doubt, but nonetheless imposes a sentence of less than death, the Commonwealth simply cannot be precluded on double jeopardy grounds from seeking the full range of penalties, including death, on retrial.

169 S.W.3d 536, 539. Thus, we explicitly upheld *Eldred.*

However, this Court now departs from both. As I do not believe that the Court was wrong in *Eldred* in 1998 or in *Salinas* in 2005 (with all concurring), and in deference to all who attempt to comply with the decisions of this Court, when and as we make them, I cannot join the majority here in reversing course. Thus, I dissent and would affirm the conviction and death penalty entered in this case consistent with our prior opinions in *Eldred* and *Salinas.*

SCHRODER, J., joins.